The ESTATE OF Jane NEUMANN and Jonathan Neumann, a minor through his Guardian ad Litem, Keith Rodli, Plaintiffs-Respondents,

v.

James NEUMANN, Defendant-Appellant.

Court of Appeals

*No. 00–0557. Submitted on briefs January 11, 2001.—Decided February 6, 2001.*

·2001 WI App 61

(Also reported in 626 N.W.2d 821.)

On behalf of the defendant-appellant, the cause was submitted on the briefs and oral argument of *R. Michael Waterman* of *Mudge, Porter, Lundeen & Seguin, S.C.* of Hudson.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief and oral argument of *Mark J. Gherty* of *Gherty & Gherty, S.C.* of Hudson.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J. James Neumann appeals two judgments that followed a July 1997 wrongful death jury trial concerning the death of his wife, Jane Neumann. One judgment requires Neumann to pay his son, the statutory beneficiary of the wrongful death action, $482,903.26 in damages. The second judgment requires Neumann to pay Jane's estate $400,000 in compensatory damages and $5 million in punitive damages for intentional infliction of emotional stress. We affirm the jury verdict holding Neumann liable for Jane's wrongful death. We also affirm the judgment requiring Neumann to pay his son $482,903.26 in damages. We reverse the judgment finding Neumann liable to the estate for intentional infliction of emotional distress.

## STATEMENT OF FACTS

¶ 2. Jane died on November 22, 1993, as a result of an intraoral gunshot wound.[1] Neumann telephoned 911 at 6:18 p.m. on that day to report her death. He told the dispatcher that his wife was dead and that his two-year-old son, Jonathan, was missing. He indicated that there was a massive wound to Jane's head. The dispatcher asked Neumann whether the wound appeared to be self-inflicted. Neumann responded: "I don't know, there's no gun or anything." Neumann eventually told the dispatcher that his son may be at the babysitter's home. The first officer to arrive at the scene later testified that Neumann was "very upset, near hysteric."

¶ 3. Law enforcement officers found Jane lying on her back in a family room in the basement. She was deceased and her face and head were severely damaged. There was no gun or other weapon in the room. Later in the evening, investigator Earl Clark and deputy Jim Richard interviewed Neumann at the sheriff's department. Clark testified at trial that during the interview, Neumann told them that Jane had called him twice earlier in the day while Neumann was at work at MedSource, where he worked with computers. Neumann said that when Jane called him the first time, she told him she wanted to play him a song and proceeded to play him "Please Forgive Me" by Bryan Adams.[2] Jane also indicated that she intended to exchange a purse at a store that afternoon.

---

[1] In other words, the gun discharged when the gun barrel was in her mouth.

[2] Clark testified that Neumann said he did not remember the name of the song the night he was interviewed, but remembered it later.

¶ 4. Neumann told Clark that when Jane called the second time, at approximately 3:30 p.m., she said that she had arrived home and that the garage door was not working correctly. She also said that she had found another door open. Neumann said he told Jane to try the garage door a few more times and then to call him back so he could try to determine what might be wrong.

¶ 5. Neumann told Clark that because his wife did not call him back, he called the home numerous times and the answering machine answered the calls. In the meantime, Neumann's boss, James Zeller, asked Neumann for a ride home. Neumann told Clark that after work he drove Zeller home and then continued to his own home. Neumann said that he entered the home and called for Jane but she did not answer. Neumann assumed she was shopping with her sister.

¶ 6. Neumann said he then went back out and tried the garage door a few times because Jane had complained the door was not working correctly. He then went back into the house and decided to watch television. When he entered the family room containing the television, he found Jane's body. Neumann told Clark that he approached Jane's body, touched her with his toe or foot, and concluded she was dead. He said he checked briefly for his son and then called the police.

¶ 7. Clark testified that his experience interviewing and interrogating people led him to believe that Neumann was not giving him all the information:

> At that time after Mr. Neumann had told me what he had found, the fact that there was life insurance on both parties, I got right into his space. . . . I point blank asked him did you kill your wife. You killed

her, didn't you. And at that time — and it was the first time through the whole interview that he actually looked at me and he told me no, I did not. I then asked him but you had her killed or knew who killed her. And he again looked me right in the eye and said I did not. . . . Mr. Neumann stuck to his story. . . . I told him I felt there was more there. He told me that's all . . . he knew. So I ended the interview. . . . I told Mr. Neumann I was requesting his shoes and his clothes and that he could call somebody to bring him a set to wear, and that was done.

Clark said that in addition to interviewing Neumann, he collected samples for a gunshot residue test that could indicate whether Neumann had recently fired a gun. After the interview was completed, Neumann was excused.

⁕ ¶ 8. Clark testified that after speaking with Neumann, he went to the Neumann home and observed Jane's body. He testified, "There were things about the scene that didn't fit the story we had up until that point. . . . [The story being that] some intruder had come in, surprised Mrs. Neumann and killed her." Clark explained that it was obvious to him that when Jane died, she was facing and was close to one of the walls. There were blood splatters on the wall. Clark said that in the laundry room on the other side of the wall the officers found a hole in the plasterboard and paneling that allowed one to see into the family room.[3]

---

[3] The hole was located approximately four feet, nine inches from the floor. Although no one testified about the precise size of the hole, photos shown to the jury show the hole to be approximately two inches in diameter. It is undisputed that there was also a smaller hole located 24 inches down and to the side of the larger hole.

¶ 9. Clark testified that after reviewing autopsy reports confirming Jane's death had been caused by a gun, law enforcement reached the tentative opinion that somehow the gun had been inserted through the larger hole in the wall so that the barrel extended into the family room. Clark said that within two days of Jane's death, law enforcement believed that her death was either an assisted suicide or possibly a suicide with an altered death scene. Clark said they decided to again interview Neumann. Neumann and his attorney met with the investigators on November 24.

¶ 10. Clark said that he told Neumann that his initial story was inconsistent with conclusions law enforcement had reached. Neumann reiterated the first part of his story, indicating that he had called his wife several times and no one had answered, and that he had driven his boss home. However, Neumann told a different version of events beginning with his entry into the home. Clark testified that Neumann told him:

> [H]e walked into the house and he thought he could smell a faint odor of gunpowder. He said he got scared. He looked straight ahead and saw that the laundry room door was closed, but he could see a light on under the door. He said he opened that door and then could smell a stronger odor of gunpowder and saw a gun lying on the floor.[4] He stated that he then ran out, ran into the TV room, saw his wife,

[4] Neumann later told police, and ultimately testified at trial, that there appeared to be a fishing line attached to the gun and leading to the wall. No fishing line was ever recovered. With this information, law enforcement theorized that Jane tied some type of monofilament line to the trigger, wrapped it around the butt of the gun, passed the line through the hole in the wall, and, when she was positioned with the gun in her mouth, pulled the line, thereby discharging the gun.

217

saw the wound to her head, touched her, called her name. And he said at that time he saw what appeared to be a note lying on the floor, that he picked it up and read it. And at that time made a determination that Jane, you're not going to have died this way. I'm not going to let your family and the world know how this happened. And at that time made a conscious — conscious effort to change the scene. . . .

He said the first thing he did was take the gun . . . [a]nd that he found a [plastic] bag and slipped a [plastic] bag over each end of the gun. He advised that it was a break-open type shotgun, that he looked, saw a shell in the chamber, closed [the gun] again. That after putting the gun in the [plastic] bags, said he also threw in some screws and bolts and other items because he knew, or at least thought, he was going to destroy it by putting it in the water. . . .

That he then took the gun out and put it on the floor of the back seat of his car. That he got in the car to leave when he suddenly got the idea I'm going to break open the front door to add to this story and make it look like a break-in. That he got out of his car, ran up, put his shoulder to the [front door], breaking the doorway from the doorjamb, got back in the car and had the intentions of putting the gun in the Willow River. And for some reason he decided that wasn't deep enough, and he changed his mind and went to the St. Croix River and threw it in the St. Croix River off the Hudson bridge.

Clark testified that Neumann described the route he had driven, how he had exited the car to throw the gun off the bridge, and returned home.

¶ 11. Clark testified that Neumann told him that when he returned home, he decided to destroy the suicide note. Clark said:

> And he said at that moment — for some reason he thought the furnace or something kicked on — but it gave him the idea there's an open flame, I'm going to burn it. Mr. Neumann advised us that he put the note underneath the furnace, caught it on fire and pulled it back out and let it burn up on the cement floor. He advised at that time he went to the bathroom, which was just outside the hall of the laundry room, got a paper towel and brushed the ashes under the towel, folded it up and flushed it down the toilet. He advised that at that time he then made a call to 911.

Clark testified that the investigation continued after Neumann gave this statement. Despite attempts to recover the bag containing the gun that Neumann said he threw in the river, no gun was ever recovered.

¶ 12. Ultimately, in early 1994, both the medical examiner and law enforcement concluded that Jane had died from suicide. In January 1994, James Neumann was charged with obstruction of justice for lying to police and disposing of the gun. Several months later, he pled no contest and was convicted.

¶ 13. By March 1994, Jane's family had serious doubts about whether Jane committed suicide and suspected Neumann may have played a role in causing her death. They encouraged law enforcement to follow up on inconsistencies in Neumann's story and hired a lawyer to help investigate. Eventually, the Department of Justice, Division of Criminal Investigation agreed to take a look at the case and determine whether there was a basis to believe Jane was murdered. The department investigated from 1995 through 1996. The

investigators ultimately concluded that there was not clear, satisfactory and convincing evidence that Jane's death was a homicide. The investigators recommended that the investigation be discontinued.

¶ 14. In 1994, Neumann received the proceeds from the $116,000 life insurance policy on his wife. Although the policy contained a suicide exclusion, the exclusion had expired four days before Jane's death so the insurance was valid, despite the medical examiner's conclusion that Jane's death was a suicide. Other smaller policies were not pursued because they had suicide exclusions.

¶ 15. In November 1995, the attorney for Jane's parents filed a motion to be named Jonathan's guardian ad litem. The attorney indicated that Jane's parents had retained him and intended to file an action to recover money for Jonathan, based on their belief that Neumann had murdered Jane. The motion was granted. The estate and Jonathan filed this wrongful death action, in which the estate also indicated that it would seek damages for Jane's pain and suffering. At the first hearing on the case, Neumann and the estate agreed on the appointment of a different guardian ad litem who had not been involved in investigating Jane's death.

¶ 16. After discovery, the matter was set for trial for June 1997. The parties ultimately agreed that the trial should be bifurcated, and that the first phase would be the liability issue. During a seven-day jury trial, jurors heard testimony from numerous witnesses, including Neumann. The testimony of several witnesses is particularly relevant to this appeal: Dr. Jeffrey Jentzen, the estate's expert, testified that Jane's death had been a homicide, and several women testified that Neumann did and said things that made

them uncomfortable (*e.g.*, he tried to give one woman flowers and touched her hair).

¶ 17. The special verdict submitted to the jury asked the following questions:

(1) Was the death of Jane Neumann a homicide?

If yes,

(a) Did James Neumann murder Jane Neumann?

(b) Did James Neumann solicit someone to murder Jane Neumann?

The jury answered the first two questions yes and the third question no.

¶ 18. After the trial, the defense asked the trial court to change the jury's answers to the first two questions; the trial court denied the motion. Neumann appealed the jury verdict to this court, but we determined the appeal was not ripe and, in January 1998, remanded for a determination of damages.

¶ 19. In October 1998, Neumann and his son (acting through the guardian ad litem) reached a stipulation on damages for the wrongful death action. The stipulation provided for damages of $482,903.26, payable to Jonathan, the statutory beneficiary of the wrongful death action. However, the stipulation reserved Neumann's right to appeal issues of liability.

¶ 20. In September 1999, Neumann moved for summary judgment on any remaining damages issues, arguing that because Jane had died instantly, the estate had no claim for pain and suffering after the gunshot. At the same time, Neumann waived his right to a jury trial on the damages issues.

¶ 21. In response, the estate argued that Jane had suffered emotional distress in the minutes before she died. The estate sought to amend the pleadings to

add a claim for intentional infliction of emotional distress. The trial court granted the motion to amend the pleadings and denied Neumann's motion for summary judgment.

¶ 22. The court then held a damages trial. The estate's expert testified about the emotions people experience when they know they are going to die. He referenced, for example, the famous war picture where a man is grimacing just before he is to be executed. The trial court ultimately found Neumann liable for intentional infliction of emotional distress and awarded the estate $400,000 in compensatory and $5 million in punitive damages for Jane's emotional distress before her death.

¶ 23. On appeal, Neumann contests the jury verdict holding him liable for Jane's death. Specifically, he argues: (1) Jentzen's opinion that the death was a homicide was based on facts beyond his expertise and is incredible as a matter of law; (2) the trial court erroneously permitted testimony regarding Neumann's alleged sexual advances to women;[5] (3) the trial court erroneously excluded additional evidence that Jane heard voices in her head; (4) the trial court erroneously excluded testimony related to polygraph testing; (5) the trial court erroneously gave falsus in uno, destruction of evidence and missing evidence jury instructions; (6) there is no credible evidence that supports the jury's finding that Neumann murdered Jane; and (7) there should be a new trial in the interest of justice. We reject each of these arguments and affirm the jury's verdict.

---

[5] Neumann characterizes the testimony as "alleged sexual advances to women." In our view, the nature of the alleged events is subject to interpretation. Perhaps a more fitting description is testimony of "alleged romantic overtures to women."

¶ 24. Neumann also argues that the trial court erroneously found him liable for intentional infliction of emotional distress and awarded punitive and compensatory damages. Specifically, Neumann argues that the trial court erroneously amended the pleadings to allow a claim for intentional infliction of emotional distress, that there is no factual basis to support the trial court's finding that Jane suffered emotional distress, and that Jane's claim for intentional infliction of emotional distress did not survive her death. We agree with the first two arguments and, therefore, reverse the judgment holding Neumann liable for intentional infliction of emotional distress.[6]

## ANALYSIS

### I. CHALLENGE TO DR. JEFFREY JENTZEN'S TESTIMONY

¶ 25. Jentzen, Milwaukee County's medical examiner, testified that in his opinion, the death was a homicide. Neumann argues that this opinion is based on facts outside the scope of Jentzen's expertise:

> Dr. Jeffrey Jentzen is a forensic pathologist. He has a medical degree, performs autopsies, and does lab work. He opined that Jane Neumann's death was a homicide, and he bases his opinion, not on medical evidence (the area in which he has training and experience), but on the fact that James Neumann altered the death scene. This opinion is beyond Dr. Jentzen's area of expertise, and it should have been excluded.

---

[6] We do not consider Neumann's third argument against liability for intentional infliction of emotional distress because the first two are dispositive.

¶ 26. Neumann conceded at oral argument that the only objections he made to Jentzen's testimony were based on the form of the questions. Neumann did not object on grounds that Jentzen was unqualified to be an expert, nor did he object when Jentzen was asked to offer his opinion based on the totality of the circumstances. Instead, Neumann challenged Jentzen's opinion through cross-examination, highlighting alleged flaws in Jentzen's reasoning and conclusions. We reject this argument because Neumann failed to object on these grounds when Jentzen was asked his opinion at trial. *See* WIS. STAT. § 901.03(1)(a)[7] (requiring a timely objection or motion to strike stating the specific ground of objection); *Behning v. Star Fireworks Mfg. Co.*, 57 Wis. 2d 183, 187, 203 N.W.2d 655 (1973) (failure to make a timely objection precludes a party, as a matter of right, from subsequently raising the point).

¶ 27. Neumann also argues that Jentzen's opinion is incredible as a matter of law and is therefore insufficient to sustain the jury's verdict. Jentzen testified that in his opinion, to a reasonable degree of certainty by clear, convincing and satisfactory evidence, the manner of death was most probably a homicide.[8] He said that he based this opinion on his review of the records, the photographs, his experience, and the *totality of the circumstances* related to the death. Neumann argues: "Dr. Jentzen's testimony boils down to his 'totality of the circumstances' opinion. Such

---

[7] All statutory references are to the 1999–2000 version unless indicated otherwise.

[8] Although the burden of proof is clear and convincing evidence, Jentzen also said his opinion would be the same even under the beyond a reasonable doubt standard used in criminal cases.

an opinion is not based on any articulated facts or analysis, but instead is based on Dr. Jentzen's speculation or hunch." To be incredible as a matter of law, Jentzen's testimony must be in conflict with the uniform course of nature or with fully established or conceded facts. *See Chapman v. State,* 69 Wis. 2d 581, 583, 230 N.W.2d 824 (1975). Because the record provides a basis for Jentzen's opinion that the death was a homicide, we reject Neumann's argument.

¶ 28. Jentzen is a board-certified clinical and forensic pathologist. He testified that at the time of the trial, he had been the medical examiner for Milwaukee County for over ten years. He explained that his role is to examine and investigate sudden and unexpected deaths. He said that when he conducts a death investigation, he not only conducts an autopsy, but "also includes the examination of the scene and the circumstances regarding the scene as well as the medical examination of the body." Jentzen testified, without objection, that part of his role as medical examiner is to consider the totality of circumstances surrounding the death, and accordingly, his opinions may be based on the totality of the circumstances. Finally, he said that he has experience with masqueraded death scenes and has lectured on the topic.

¶ 29. Jentzen testified that in this case, he reviewed the scene photographs and the autopsy protocol. He said that he found significant the fact that Jane was wearing her coat at the time of death and that her purse was placed next to the scene area. He noted that there were two holes in the wall, the larger hole (through which everyone agreed the gun had been placed) and a smaller hole through which, Jentzen had been told, a monofilament-like fishing line had been placed. He also saw pink bubble-wrap material and

black electrical tape on the family room floor. The autopsy report indicated that the same materials were recovered from Jane's skull. Jenzten testified:

> [Jane] was . . . fully dressed in outdoor attire. The purse in the scene would indicate that [Jane] came directly [to the family room] as she entered the home. . . . I can only describe the setup and the detonation of the weapon as an elaborate setup in which it would be my opinion that there was some attempt to either obscure the end of the weapon or provide some kind of a silencer-type material to the end of the weapon. And the method of detonation of the weapon . . . would be highly elaborate.

¶ 30. Jentzen also said that the case materials were presented to three other board-certified forensic pathologists in his office for discussion and interpretation. Jentzen testified that it was the unanimous opinion of the group that the death was most probably a homicide.

¶ 31. In light of Jentzen's experience and education, we cannot conclude that his testimony, including his opinion that the death was a homicide, is incredible as a matter of law. Although a jury may, if it so desires, place less credence in the testimony of a witness whose evidence is inconsistent (as Neumann argues is the case here), alleged inconsistencies do not render testimony incredible as a matter of law. *See Millonig v. Bakken,* 112 Wis. 2d 445, 453–54, 334 N.W.2d 80 (1983).

¶ 32. Finally, we note that in light of Neumann's own expert's testimony, it is inconsistent for Neumann to argue that Jentzen should not have been allowed to base his opinion on non-medical facts. Neumann asked Dr. Michael McGee, a forensic pathologist who per-

formed Jane's autopsy and served as an expert witness for Neumann, to comment on the significance of Jane returning a purse at 3:15 p.m. the day of her death, wearing a coat at the time of death, behaving normally prior to death, and the facts that there was bubble-wrap and electrical tape in her wound and that Neumann admitted disposing of the gun.

¶ 33. Ultimately, McGee testified that none of these factors changed his opinion that, based on his training, experience and review of facts in the case, Jane's death was a suicide. Neither Jentzen's opinion nor McGee's opinion is incredible as a matter of law. The jury had before it two credible opinions, and it was within the jury's power to observe the witnesses and determine the weight to be given to their testimony.

## II. CHALLENGE TO ADMISSION OF TESTIMONY FROM THREE WOMEN

¶ 34. Neumann challenges the admission of testimony from three female witnesses. Neumann characterizes their testimony as statements regarding "alleged sexual advances." He cites specific testimony that he argues was irrelevant and unfairly prejudicial. However, the testimony he cites with respect to two of the women, Diane Fandler and Mary Sue Englund, was presented without objection by Neumann. Accordingly, Neumann waived his objection to Fandler's and Englund's testimony. *See* WIS. STAT. § 901.03(1)(a); *Behning*, 57 Wis. 2d at 187.

¶ 35. Neumann did preserve his objection to the testimony of the third woman, Jennifer Pejka, whose videotaped deposition was played for the jury. Pejka testified that she was a receptionist from 1990 through

1992 at MedSource, and that Neumann was a co-worker. Pejka said that toward the end of her employment, Neumann brushed her hair off her shoulder a couple of times, which made her uncomfortable.

¶ 36. Pejka also testified that in the spring of 1993, after leaving MedSource, she called Neumann to see if he could convert a computer disk for her. Neumann offered to give her a ride home so they could exchange the disk. When Neumann arrived, he brought a dozen roses for Pejka. Pejka said she told him she could not accept the flowers and suggested he give them to his wife. He replied that he would get rid of them somehow.

¶ 37. Pejka said Neumann subsequently called her and offered to pay for her parking in downtown Minneapolis so she would not have to take the bus. She declined.

¶ 38. Finally, Pejka said she and another former MedSource employee encountered Neumann and Neumann's son at a Target store. Pejka testified that she said hello to Neumann but did not talk to him at length because she had felt uncomfortable since the incident with the roses. When Pejka arrived home later that afternoon, Neumann and his son were in his car in Pejka's apartment parking lot. She told Neumann she was uncomfortable with him being there, and he agreed to leave.

¶ 39. On cross-examination, Pejka testified that when she told Neumann that he made her uncomfortable, Neumann told her he did not know she felt that way and left. She also said that he had not bothered her in any respect since that day.

¶ 40. Neumann objected to Pejka's testimony on grounds that it was irrelevant and unfairly prejudicial. He questioned how the testimony would show that it

was more or less likely that he was involved in Jane's death, the key issue in the case. The trial court concluded that the testimony was relevant character evidence and that its relevance outweighed any potential prejudice.

¶ 41. We conclude that even if the admission of Pejka's testimony was error, the error was harmless and is therefore not grounds for reversal or a new trial. Error may not be predicated upon an evidentiary ruling unless a substantive right of the party is affected. WIS. STAT. § 901.03(1).[9] We may not reverse a judgment or grant a new trial due to an erroneous evidentiary ruling unless an examination of the entire trial leads us to conclude that the erroneous ruling affected the substantial rights of the party seeking relief on appeal. *See* WIS. STAT. § 805.18(2).[10] A reversal is required

---

[9] WISCONSIN STAT. § 901.03 provides in relevant part:

 (1) EFFECT OF ERRONEOUS RULING. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

 (a) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

 (b) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

[10] WISCONSIN STAT. § 805.18(2) provides:

 No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

under § 805.18(2) only if the result might, within reasonable probabilities, have been more favorable to the complaining party had the error not occurred. *Nowatske v. Osterloh*, 201 Wis. 2d 497, 507, 549 N.W.2d 256 (Ct. App. 1996). This requires that we weigh the effect of the inadmissible evidence against the totality of the credible evidence supporting the verdict. *See id.*

¶ 42. Pejka's videotaped testimony constituted only six minutes of a seven-day jury trial. Her testimony established that Neumann touched her hair, attempted to give her roses and went to her home to see her. We fail to see how this testimony would have led a jury to conclude Neumann killed his wife. We are also unconvinced that exclusion of this testimony would have changed the jury's verdict. Accordingly, even if this testimony was erroneously admitted, the error was harmless.

### III. CHALLENGE TO EXCLUSION OF ADDITIONAL TESTIMONY THAT JANE HEARD VOICES

¶ 43. Neumann argues that he had evidence that Jane heard voices in her head and intended to use the evidence to refute the estate's claims "that Jane . . . was so perfectly stable that she could not have committed suicide." However, Neumann acknowledges that the court allowed the jury to hear some limited evidence on this issue. Furthermore, the only evidence he claims was not presented was additional testimony by a pastor and Jentzen. We are unconvinced that the trial court erroneously exercised its discretion when it excluded this testimony.

¶ 44. Evidentiary issues are addressed to the trial court's discretion. *State v. Pharr*, 115 Wis. 2d 334,

342, 340 N.W.2d 498 (1983). The exercise of discretion leaves areas where reasonable minds may differ. *See Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). As long as the court reaches a decision within the parameters of reasonableness, it is inappropriate to interfere with the trial court's exercise of discretion. *Barrera v. State*, 99 Wis. 2d 269, 282, 298 N.W.2d 820 (1980).

¶ 45. In pretrial motions, the court ruled that Neumann would not be allowed to elicit any testimony about voices Neumann claims that Jane heard in her head. The court voiced its concern that Neumann did not plan to call an expert who would testify that one who hears voices may be more likely to commit suicide. The court stated that it may allow the testimony of an expert if Neumann was able to find one. Despite its earlier ruling, the trial court ultimately allowed limited testimony, even though Neumann did not produce an expert to interpret the significance of Jane hearing voices.

¶ 46. Neumann asked both of Jane's parents whether they knew she heard voices. Both replied they did not. Neumann himself was allowed to testify that in 1987 he became aware that Jane heard voices. Neumann said Jane believed the voices were real. He stated that the voices came and went and that he and Jane had discussed them within months of her death. Neumann testified that Jane told him that "these were scary voices that were telling her to do things disgusting." Neumann said, "She was very scared of them. She thought they were going to make her go to hell."

¶ 47. Pastor Steven Cornelius, the minister who provided the Neumanns with pre-marital counseling and performed their wedding ceremony, was allowed to testify that the Neumanns came to see him because

Jane had been troubled by some voices she was hearing. Cornelius said Jane told him that the voices prompted her to think and say things that she knew were wrong. He also indicated that he gave her counseling about the voices and encouraged her to implement some meditation and prayer to counter the voices.

¶ 48. On appeal, Neumann argues that the trial court did not permit Cornelius to fully testify as to his knowledge of the voices. We have examined the record and can find only two statements that were not admitted as testimony: one statement was stricken and the other was provided in an offer of proof.

¶ 49. In the first statement, in answer to a question about what caused him to believe Jane was hearing voices, Cornelius testified, "I think they were — it just wasn't established whether it was audible or whether it was internal, definitely something that was a reality to her." When Neumann made an offer of proof outside the jury's presence, he asked Cornelius whether he was given any impression as to whether the voices were audible. Cornelius replied, "I don't think it was established. All I know that as — as she shared it, it was an internal thing that was a continued problem for her."

¶ 50. We are unconvinced that the trial court erroneously exercised its discretion when it excluded this testimony. We fail to see how these two statements would have made the testimony related to voices any more compelling or relevant to the issues at trial.

¶ 51. Finally, Neumann argues that Jentzen should have been allowed to testify that he did not know Jane heard voices. Neumann argues:

232

[Jentzen] did not know that Jane Neumann heard voices. Dr. Jentzen also testified, by way of an offer of proof, that such information would have been beneficial during the course of his investigation. Dr. Jentzen's opinion boiled down to a "totality of the circumstances," but he was not made aware of all of the facts, and he was not cross-examined on this point because of the circuit court's erroneous ruling.

¶ 52. Neumann was not permitted to ask Jentzen in the presence of the jury about voices Jane may have heard. However, in his offer of proof, Neumann asked Jentzen whether he had been advised that Jane heard voices. Jentzen answered no. Neumann continued:

Q: Doctor, would it be significant to you, as a forensic pathologist, whether or not a person who's under consideration for whether or not they committed suicide heard voices?

A: That would be information that would be beneficial to know during the course of the investigation, yes.

Upon further examination, Jentzen testified that the circumstances of the medical history is always beneficial information. "[T]he more information that you have is beneficial for the overall case evaluation." Significantly, Jentzen also said that he had heard nothing in the comments or questions of counsel that would cause him to change his opinion in any sense.

¶ 53. Neumann implicitly argues that if the testimony elicited in the offer of proof had been presented to the jury, the jury's assessment of Jentzen's testimony could have been different. We are unpersuaded. Speculation about whether the jury would have had less faith in Jentzen's opinion if he testified his opinion was the

same even with knowledge of the voices is an insufficient basis for concluding the trial court erroneously exercised its discretion.

## IV. CHALLENGE TO EXCLUSION OF TESTIMONY ABOUT POLYGRAPH TESTING

¶ 54. Approximately one month after Jane's death, Neumann submitted to a polygraph test. The examiner concluded that Neumann truthfully answered "no" to six relevant questions.[11] Neumann sought to admit the results of the test, testimony from three defense experts that their conclusions were based in part on the results of the test, and evidence that Neumann "took a polygraph examination." The trial court excluded all testimony related to the polygraph test. The trial court concluded that the test results are not legally admissible in Wisconsin, and that even if they were, the specific questions posed in Neumann's examination made the results unreliable.[12] The trial

---

[11] The six relevant questions were:

1. Did you physically do anything to cause the death of Jane Neumann November 22nd?

2. On November 22, did you shoot Jane?

3. Prior to finding her November 22nd, did you know she was going to commit suicide?

4. Are you now withholding any information about how Jane obtained that gun?

5. Before November 22nd, did you ever see that gun?

6. Are you now lying about how you say you got rid of that gun November 22nd?

[12] Because we conclude that the results of polygraph tests are inadmissible, we do not consider whether the trial court erroneously excluded the results on grounds that the testing of Neumann was unreliable.

court did not explicitly address Neumann's attempt to introduce evidence that he took a polygraph examination.

¶ 55. On appeal, Neumann makes the same arguments, although he now argues that the trial court erroneously excluded evidence that he "offered to take a polygraph examination" rather than "took a polygraph examination." We reject his arguments and affirm the trial court's exclusion of the testimony.

¶ 56. A review of the law in Wisconsin relating to polygraph admissibility is appropriate. Prior to 1974, all polygraph evidence was excluded. *State v. Dean*, 103 Wis. 2d 228, 238–39, 307 N.W.2d 628 (1981). In *State v. Stanislawski*, 62 Wis. 2d 730, 216 N.W.2d 8 (1974), our supreme court reconsidered the rule of blanket exclusion of polygraph evidence. *Dean*, 103 Wis. 2d at 239. Under *Stanislawski*, polygraph evidence became admissible in criminal cases under certain conditions. *See Dean*, 103 Wis. 2d at 244. For instance, it was required that the district attorney, defendant and defense counsel sign a stipulation providing for the admission of the evidence at trial. *See id.*

¶ 57. Seven years later, our supreme court in *Dean* concluded that it was not satisfied with *Stanislawski* and held that it is error for a trial court to admit polygraph evidence in a criminal proceeding. *See Dean*, 103 Wis. 2d at 279.

¶ 58. In the years since *Dean*, our supreme court has not approved the admission of polygraph results in either criminal or civil cases. In 1982, however, this court held that although a polygraph test result might itself be inadmissible, an offer to take a polygraph test is relevant to an assessment of the offeror's credibility and may be admissible for that purpose. *See State v. Hoffman*, 106 Wis. 2d 185, 217, 316 N.W.2d 143 (Ct.

App. 1982). Most recently, in *State v. Santana-Lopez*, 2000 WI App 122, ¶¶ 4–5, 237 Wis. 2d 332, 613 N.W.2d 918, we commented on the admission of offers to undergo polygraph testing and DNA analysis:

> [B]oth an offer to take a polygraph test and an offer to undergo a DNA analysis are relevant to the state of mind of the person making the offer—so long as the person making the offer believes that the test or analysis is possible, accurate, and admissible. *See State v. Hoffman . . . cf. Hemauer v. State*, 64 Wis. 2d 62, 74–76, 218 N.W.2d 342, 348 (1974) (offer to take polygraph test not admissible where tests results would not be admissible—no argument that defendant believed that the results would have been admissible); *United States v. Harris*, 9 F.3d 493, 502 (6th Cir. 1993) (failure to agree to the admissibility of polygraph test results irrespective of outcome rendered willingness to take test only "marginally relevant"). . . . Simply put, an offer to undergo DNA testing, like an offer to take a polygraph examination, may reflect a consciousness of innocence.
>
> As with evidence bearing directly on consciousness of guilt, *see, e.g., State v. Schirmang*, 210 Wis. 2d 324, 331–332, 565 N.W.2d 225, 228 (Ct. App. 1997) (refusal to submit to mandatory blood-alcohol testing relevant to defendant's consciousness of guilt), evidence bearing directly on consciousness of innocence is also relevant, *see Hoffman*, 106 Wis. 2d at 217, 316 N.W.2d at 160.

## A. Admission of polygraph test results

¶ 59. Neumann first argues that the results of his polygraph test should have been admitted at trial. He acknowledges that "Wisconsin blanketly excludes polygraph test results from criminal trials and probation revocation proceedings." However, he argues that

the supreme court has never specifically addressed the admissibility of polygraph results in a purely civil case. He explains, "The unconditional rejection of expert testimony based on polygraph testing is contrary to a developing trend in the law to admit valid polygraph results. . . . Most polygraph cases arise in criminal law contexts, but the standards for admissibility can be applied to a civil case."

¶ 60. Although some jurisdictions have admitted the results of polygraph examinations, our supreme court has explicitly indicated that with respect to criminal cases, the results are inadmissible. *See Dean,* 103 Wis. 2d at 279. The primary basis for this holding was the court's lack of confidence in the reliability of polygraph test results. *See id.* at 278–79. This court is bound by the decisions of the supreme court. *State v. Clark,* 179 Wis. 2d 484, 493, 507 N.W.2d 172 (Ct. App. 1993). Accordingly, unless and until our supreme court overrules *Dean,* polygraph results in criminal cases will remain inadmissible.

¶ 61. Neumann argues that because the supreme court has not closed the door on admitting polygraph results in civil cases, the trial court should have admitted the results of his polygraph in this civil case. We reject this argument. First, *Dean* did not indicate that there could be different rules of polygraph admissibility for criminal and civil cases. Second, our supreme court's reasons for excluding polygraph test results in criminal cases would apply equally to civil cases. Finally, we do not believe the supreme court would sanction allowing polygraph results in civil cases if they are inadmissible in criminal cases. A criminal defendant has a constitutional right to present a defense. *See State v. Dodson,* 219 Wis. 2d 65, 71–72, 580 N.W.2d 181 (1998). If polygraph results offered by

a defendant as part of the exercise of a constitutional right are inadmissible, then polygraph results are surely inadmissible when no constitutional right is at stake.

¶ 62. We conclude that the results of polygraph examinations are inadmissible in civil cases in Wisconsin. Accordingly, we conclude that the trial court reasonably exercised its discretion when it denied Neumann's motion to admit the results of his examination.

## B. Admission of testimony that Neumann's experts relied on polygraph test results

¶ 63. Neumann also argued that his experts should have been allowed to testify that they relied in part on the results of Neumann's polygraph examination in forming their opinions. Specifically, defense experts, including Max Ihrke, Earl Clark and Martin Shanklin, would have testified that they believed Jane's death was a suicide in part because Neumann passed a polygraph examination. Testimony such as that proposed by Neumann would inform the jury that a polygraph had been taken and allow the jury to infer that those results were favorable to Neumann. The effect would be the admission of polygraph results, which we have already concluded are inadmissible. Therefore, the trial court correctly excluded this testimony as well.

## C. Admission of evidence that Neumann took a polygraph test

¶ 64. Finally, Neumann argues that the trial court erroneously excluded evidence that he offered to

take a polygraph examination. We held in *Hoffman* that an offer to take a polygraph examination is relevant to an assessment of the offeror's credibility and may be admissible for that purpose. *Id.* at 217. However, as Neumann acknowledged at oral argument, he did not offer to take a polygraph examination. Instead, law enforcement asked him to take the examination and he agreed. Neumann contends that even though law enforcement suggested the test, his willingness to take the test should still be admissible under the same reasoning applied in *Hoffman*.

¶ 65. Even if we were inclined to extend our ruling in *Hoffman* to cases where an individual agrees to take a polygraph test, we would have to be convinced that the individual's willingness to take the test was relevant to credibility. We explained in *Santana-Lopez* that an offer to take a polygraph is relevant to the state of mind of the person making the offer as "long as the person making the offer believes that the test or analysis is possible, accurate, and admissible." *Santana-Lopez*, 2000 WI App 122 at ¶ 4.

¶ 66. Neumann has supplied no offer of proof establishing that when he agreed to take the test, he believed the results could accurately indicate whether he was lying when he denied killing his wife and that he believed the results would be admissible in court. Without this testimony, we cannot exclude the possibility that Neumann was advised that the test would be inadmissible in court and he should therefore take the test because he had nothing to lose by taking it.

¶ 67. When a claim of error is based upon the erroneous exclusion of evidence, an offer of proof must be made in the trial court as a condition precedent to the review of any alleged error. *McClelland v. State*, 84

Wis. 2d 145, 153, 267 N.W.2d 843 (1978). Because Neumann did not make an offer of proof relevant to his state of mind at the time he agreed to take the test, we decline to consider further whether to extend *Hoffman* to cases where an individual agrees, rather than offers, to take a polygraph test. Accordingly, we conclude that the trial court did not erroneously exercise its discretion when it excluded testimony about Neumann's willingness to take the polygraph test.

## V. CHALLENGE TO THREE JURY INSTRUCTIONS

■■■■

¶ 68. Neumann argues that the trial court erroneously exercised its discretion when it gave three jury instructions: falsus in uno, destruction of evidence and missing evidence. A trial court possesses broad discretion to choose the language and emphasis of jury instructions as long as the instructions fully and fairly inform the jury of the rules of law applicable to the case. *Seichter v. McDonald*, 228 Wis. 2d 838, 847, 599 N.W.2d 71 (Ct. App. 1999). If the instructions comport with the facts and are a correct statement of the law, we will not find error. *State v. Ostensen*, 150 Wis. 2d 656, 660–61, 442 N.W.2d 501 (Ct. App. 1989).

### A. Falsus in Uno Instruction

■■■■

¶ 69. Neumann first challenges the trial court's decision to read the falsus in uno jury instruction, WIS JI—CIVIL 405. That instruction provides:

> If you become satisfied from the evidence that any witness has willfully testified falsely as to any material fact, you may, in your discretion, disregard

all the testimony of such witness which is not supported by other credible evidence in the case.

In Wisconsin, a falsus in uno instruction is appropriate only in situations where a witness willfully and intentionally gives false testimony relating to a material fact, and is not proper where there are mere discrepancies in the testimony that are most likely attributed to defects of memory or mistake. *Ollman*, 178 Wis. 2d at 659–60. A falsus in uno instruction can be appropriate even if the witness later admits to having testified falsely. *See id.* at 660.

¶ 70. At the jury instruction conference, the estate argued that there was an evidentiary basis to show there was willful, false swearing to a material fact, based on Neumann's testimony in two depositions and at trial. Specifically, the estate noted that in his first deposition, Neumann gave new versions of his story and raised "the issue of his top secret security clearance and other issues."[13] The estate argued that in his second deposition and in his trial testimony, there were discrepancies not likely to be defects of memory or mistake.

¶ 71. The trial court agreed that the falsus in uno instruction was appropriate. "I know it's rarely given. I don't often give it, but if ever a case speaks to this particular instruction, this is the case." We have examined Neumann's answers to interrogatories, his March 1996 deposition and his trial testimony. We conclude that the trial court did not erroneously exercise its discretion when it concluded that there was a suffi-

---

[13] Neumann admitted at trial that he told two individuals stories about being involved in secret government projects. He ultimately recanted these stories. This issue is discussed in more detail later in this opinion.

cient evidentiary basis to show there was willful false swearing to a material fact.[14]

¶ 72. First, there were numerous inconsistencies in Neumann's testimony about the chain of events between the time he arrived home and the time he telephoned 911. For example, in his March 1996 deposition, Neumann testified that he read the suicide note, hung a picture on the wall over the hole, and then packaged the gun. In his June 1996 deposition, Neumann testified that he hung the picture on the wall after he returned home from throwing the gun in the river.

¶ 73. Second, Neumann ultimately argued that he may have arrived home as early as 5:28 p.m. and as late as 5:55 p.m. Neumann testified that he did many things between the time he found his wife's body and called 911 at 6:18 p.m. Specifically, he said he viewed the body, read the suicide note, hung a picture over the hole in the wall, packaged the gun, donned a trenchcoat, broke the front door, drove to the bridge, jumped a fence, ran out onto the bridge, dropped the gun, returned to his car, drove home and burned the suicide note. Given this list of activities and testimony about the time it would take to drive several miles to the bridge and back, there is evidence Neumann would not have had time to do all the things he said he did.

¶ 74. Finally, when Neumann was called adversely as the first trial witness, he said he was unable to remember specific events. However, when he testified later in the trial, he was able to offer explana-

---

[14] The comment to WIS JI—CIVIL 405 explains: "To warrant giving this instruction, the trial court must be satisfied that there is sufficient evidentiary basis to show there was willful false swearing to a material fact. Pumorlo v. Merrill, 125 Wis. 102, 103 N.W. 464 (1905)."

tions for those same events, thereby contradicting his testimony that he was unable to remember the events on the first day of trial. For instance, he was asked whether he remembered telling co-worker Diane Fandler that Jane had told him he should go out and have sex with someone else because Jane could not satisfy him. He responded "I don't specifically remember that." When he took the stand again later in the trial, he gave the following testimony:

> Q At least one of the witnesses has testified that you told her that Jane said you should have sex with other women or something to that effect. Do you know what I'm talking about?
>
> A Yes.
>
> Q Tell the jury about that.
>
> A Jane and I had many conversations where she would be crying or upset or trying to get my assurance of my love for her. During one of those conversations, she was concerned that she wasn't sexually satisfying, and she made a comment that you should just go out and have sex with somebody so that you could be satisfied. I never perceived that as something she actually meant. She said a lot of things like that. I didn't have sex with somebody else, and I didn't take it as an instruction to go do that.

¶ 75. In summary, the numerous inconsistencies and contradictions in Neumann's deposition and trial testimony form an evidentiary basis to show there was willful swearing to material facts. The trial court did

not erroneously exercise its discretion when it gave the instruction.[15]

## B. DESTRUCTION OF EVIDENCE INSTRUCTION

¶ 76. Next, Neumann claims the trial court erroneously issued a destruction of evidence jury instruction. The instruction was read as follows: "There is a duty on a party to preserve evidence essential to a claim. A failure to take adequate steps to preserve evidence wholly within the party's control may give rise to an inference that the evidence was unfavorable to the party failing to preserve the document." Neumann argues that the instruction was worded incorrectly and, in any event, should not have been given because the duty to preserve evidence arises when litigation is commenced, not before.

¶ 77. Neumann contends the instruction language was flawed because the instruction failed to mention the fact "that the presumption is rebuttable." We reject this argument because Neumann did not raise it at the jury instruction conference and did not suggest any language changes to the court. *See* WIS. STAT. § 805.13(3) ("Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.").

¶ 78. Moreover, at the jury instruction conference, Neumann indicated that he approved of a

_____

[15] We note that even if the falsus in uno instruction is given, the jury is not required to find that a witness willfully testified falsely. The instruction merely gives the jury the option of disregarding testimony if the jury becomes "satisfied from the evidence that any witness has willfully testified falsely as to any material fact." *See* WIS JI—CIVIL 405.

language change that the trial court had already made: the instruction would read "may give rise to an inference" instead of "gives rise." We read this change as creating an inference rather than a presumption. "Inferences are by their nature permissive, not mandatory: although the fact proved rationally supports the conclusion the offering party hopes will be inferred, the factfinder is free to accept or reject the inference." 29 AM.JUR.2D *Evidence* § 182 (1994).

¶ 79. Neumann did preserve his objection to giving the destruction of evidence instruction, arguing at the jury instruction conference that the instruction was inappropriate because "Mr. Neumann was not a party at the time he destroyed the gun or the note." Therefore, we will consider this argument. At issue is evidence spoliation, "the destruction or withholding of critically probative evidence resulting in prejudice to the opposing party." *See Slattery v. United States*, 46 Fed.Cl. 402, 404 (2000).

¶ 80. Courts have fashioned a number of remedies for evidence spoliation. The primary remedies used to combat spoliation are pretrial discovery sanctions, the spoliation inference, and recognition of independent tort actions for the intentional and negligent spoliation of evidence. *See* Cecilia Hallinan, *Balancing the Scales After Evidence Is Spoiled: Does Pennsylvania's Approach Sufficiently Protect the Injured Party?*, 44 VILL L. REV. 947, 950 (1999). Wisconsin has recognized the first two remedies. *See Sentry Ins. v. Royal Ins. Co.*, 196 Wis. 2d 907, 918–19, 539 N.W.2d 911 (Ct. App. 1995) (upholding trial court's exclusion of evidence related to refrigerator where party's expert intentionally removed components, thereby precluding testing by opposing party); *Jagmin v. Simonds Abrasive Co.*, 61 Wis. 2d 60, 80–81, 211

N.W.2d 810 (1973) (holding that spoliation inference is inappropriate where evidence was negligently destroyed, but may be appropriate where destruction is intentional).

¶ 81. The spoliation inference is derived from the maxim *omnia praesumuntur contra spoliatorem*, or "All things are presumed against a despoiler or wrong-doer." *See* BLACK'S LAW DICTIONARY 1086 (6th ed. 1990). Where the inference is applied, the trier of fact is permitted to draw an inference from the intentional spoliation of evidence that the destroyed evidence would have been unfavorable to the party that destroyed it. *See Beers v. Bayliner Marine Corp.*, 675 A.2d 829, 832 (Conn. 1996).

¶ 82. In *Jagmin*, the plaintiff sought to instruct the jury that it could infer that certain negligently-destroyed evidence was unfavorable to the defendant. *See id.* at 79. The proposed jury instruction stated:

> Evidence has been received in this case that the broken abrasive wheel was taken by the defendant's representative after the accident. It was the duty of Simonds Abrasive Company to keep and safeguard the broken grinding wheel. If you determine that Simonds Abrasive Company breached this duty and it was wholly their fault that the means of ascertaining the truth are not available, then you may infer from such conduct and circumstances alone that the wheel was defective and that such defect caused the injury to Harry Jagmin unless the defendant has offered you an explanation of the accident which is satisfactory to you.

*Id.* Our supreme court affirmed the trial court's refusal to give the instruction in the absence of clear, satisfactory and convincing evidence that the defendant

intentionally destroyed or fabricated evidence by substituting a second wheel. *See id.* at 80–81. The court went on to explain:

> In Wisconsin the operation of the maxim *omnia praesumuntur contra spoliatorem* is reserved for deliberate, intentional actions and not mere negligence even though the result may be the same as regards the person who desires the evidence.

*Id.* at 81.

¶ 83. Unlike the plaintiff in *Jagmin*, the estate in this action presented clear, satisfactory and convincing evidence that Neumann destroyed relevant evidence. Neumann has admitted that he intentionally destroyed the gun that killed Jane and, if there was one, the suicide note. Neumann's challenge to the jury instruction allowing the spoliation inference is that his admitted destruction was not committed during the course of litigation. We reject this challenge because in some circumstances, the remedies for spoliation of evidence are available even where litigation has not yet commenced.

¶ 84. In *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis. 2d 707, 724, 599 N.W.2d 411 (Ct. App. 1999), this court held that dismissal as a sanction for destruction of evidence requires a finding of egregious conduct, "which, in this context, consists of a conscious attempt to affect the outcome of litigation *or a flagrant knowing disregard of the judicial process.*" (Emphasis added). *Garfoot* reaffirmed *Milwaukee Constructors II v. Milwaukee Metro. Sewerage Dist.*, 177 Wis. 2d 523, 502 N.W.2d 881 (Ct. App. 1993), which quoted with approval a New Jersey case that required courts evaluating allegations of document destruction to examine *"whether [the party] knew or should have known at the*

*time it caused the destruction of the documents that litigation against [the opposing parties] was a distinct possibility." See Garfoot*, 228 Wis. 2d at 724; *Milwaukee Constructors II*, 177 Wis. 2d at 532 (quoting *Struthers Patent Corp. v. Nestle Co.*, 558 F. Supp. 747, 756 (D.N.J.1981)) (emphasis added).

¶ 85. Similarly, courts in other jurisdictions have recognized the appropriateness of the spoliation inference if a party fails "to preserve property for another's use as evidence in pending or reasonable foreseeable litigation." *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). In *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267 (Ill. 1995), the court, evaluating whether a party could recover for negligent spoliation of evidence, observed: "The general rule is that there is no duty to preserve evidence; however, a duty to preserve evidence may arise through an agreement, a contract, a statute . . . or another special circumstance." *Id.* at 270–71. Although the discussion in *Boyd* was framed in terms of "duty" because it was evaluating negligent spoliation, we believe the principles are equally applicable in this case.

¶ 86. When Neumann removed and then intentionally destroyed the gun used in the violent death of his wife, he knew or should have known he was interfering with potential civil and criminal litigation. By his own admission, he intended to destroy evidence. Although Neumann argues he did so to protect his wife's memory, this does not negate his intent to destroy the evidence. It is undisputed that this intentional spoliation interfered with law enforcement's investigation, the estate's case, and even Neumann's own defense. Under these circumstances, the destruction of evidence instruction was appropriate.

Accordingly, the trial court did not erroneously exercise its discretion when it agreed to instruct the jury on destruction of evidence.

## C. Missing documents instruction

■

¶ 87. Neumann challenges a third jury instruction that the trial court gave because Neumann testified that he destroyed the suicide note. The trial court instructed the jury:

> If a party fails to present evidence most likely to be within its control and the party fails to give a satisfactory explanation for not presenting the evidence, then you may infer that the evidence would be unfavorable to the party who failed to produce the document in question.

Neumann argues in a footnote in his brief that this instruction is erroneous for the same reasons that the destruction of evidence instruction is erroneous. We need not consider this argument further because Neumann fails to develop it on appeal. *See State v. Flynn,* 190 Wis. 2d 31, 58, 527 N.W.2d 343 (Ct. App. 1994). Also, we note that it does not appear that Neumann objected to the instruction at the jury instruction conference. If no objection is made, this court is without the power to consider the alleged error on appeal. *See State v. Ward,* 228 Wis. 2d 301, 305, 596 N.W.2d 887 (Ct. App. 1999).

## VI. SUFFICIENCY OF THE EVIDENCE

■

¶ 88. Next, Neumann argues that there is no credible evidence to sustain the jury's verdict. A jury verdict will be sustained if there is any credible evi-

dence to support the verdict. *Finley v. Culligan*, 201 Wis. 2d 611, 630, 548 N.W.2d 854 (Ct. App. 1996). This is even more true where, as here, the verdict has the trial court's approval. *See id.* at 630–31. Before a reviewing court will reverse, there must be such a complete failure of proof that the verdict must have been based on speculation. *Id.* at 631. The credibility of the witnesses and the weight to be afforded their individual testimony are left to the jury. *Id.* Our consideration of the evidence must be done in the light most favorable to the verdict, and when more than one inference may be drawn from the evidence, we are bound to accept the inference drawn by the jury. *Id.*

¶ 89. Based on our review of the record, much of it covered in the discussion just completed, we conclude that the jury could have reasonably concluded (1) that Jane's death was a homicide; and (2) that Neumann murdered Jane. We address each issue in turn.

## A. Whether Jane's death was a homicide

¶ 90. We note that with respect to cause of death, the jury was presented with only two theories: homicide and suicide. The jury was instructed as follows: "Homicide is defined as the killing of one human being by the act or solicitation to commit murder by another by other than voluntary or self-inflicted means. A suicide is not a homicide." Accordingly, credible evidence that supports the jury's conclusion that Jane's death was a homicide includes evidence that the death was not a suicide.

¶ 91. Both parties presented evidence that, they argued, showed whether Jane was suicidal. For example, there was testimony that Jane had worked as a graphic designer at MedSource for approximately three months in what her boss termed a trial period.

The job did not work out, and Jane left the company in June 1993. Neumann testified that Jane had been fired and that she cried every night afterward until she died six months later. Conversely, the estate presented testimony that Jane was happy with her new job in the days prior to and including her death. Neither of the parties called an expert to identify the signs of impending suicide.[16] Instead, it is apparent that the parties intended that members of the jury would use their common experience to evaluate whether Jane's conduct suggested she was suicidal.

¶ 92. Numerous witnesses testified that Jane's conduct in the weeks, days and hours before her death was inconsistent with her committing suicide. Jane's physician, Dr. Gwen Halaas, testified that Jane had a routine medical appointment with her on November 2, twenty days before her death. Halaas said that she has a checklist of issues she discusses with patients, and that she and Jane went through the checklist at Jane's appointment.

¶ 93. Halaas stated that her checklist includes a discussion of stress management. Halaas said there were no "red flags" that went up during her conversation with Jane. "I had known Jane for a long time at this point, years. . . . I didn't have any concerns. When she left the exam, I felt that she was feeling healthy, relatively happy."

¶ 94. Jane's brother, Charles James Johnston, testified that he spoke with Jane on the telephone days

---

[16] Both Jentzen and McGee answered questions about whether certain facts such as Jane returning a purse hours before her death affected their opinions that the death was either homicide or suicide. However, they were not called as experts to offer general information about the signs and causes of suicide.

before her death. They discussed the fact that Jane was going to be reducing her work hours to spend more time with her son. Charles said Jane was "extremely excited about the fact that she was cutting back hours." He said that Jane also seemed happy that she and their sister, Mary, were discussing the possibility that Mary might move next door and the two women could raise their children together.

¶ 95. Two days before her death, Jane visited the cosmetologist she had been seeing for six years. The cosmetologist testified, "[S]he came in and gave me a hug. . . . And she was so excited to tell that she found out at her job she could work less hours and spend more time with Jonathan . . . and she was very excited to have her entire family over [for Thanksgiving]." Jane also made an appointment to get her hair colored a week later.

¶ 96. On the morning of the day she died, Jane called her mother and discussed plans to have Thanksgiving dinner on November 25 at Jane's house. They talked about the menu and who would cook the turkey. Her mother testified that she did not perceive that anything was troubling Jane and that Jane was "really looking forward to the holidays." Her mother also said that in general, Jane's demeanor was upbeat. "I'm hearing things [at trial] about Jane being depressed, and I'd like to know when. If she hid it this well from all of us, I don't know."

¶ 97. Jane worked at FBS Mortgage the day she died. She spent an hour and a half with Reolita Paray, a woman she met that day. The two discussed a project Paray had been hired to do at FBS. Paray testified:

> Jane seemed to be very knowledgeable about the area that she is involved in. . . . She seemed to be

very comfortable. I asked her several questions and
she was ready to give the answers. . . . She was very
pleasant and very cordial during that day. . . . Dur-
ing the course of our conversations she mentioned
[she had] a son. . . . She was very excited about her
son, I can say that for sure.

Jane's boss also testified that on the same day, she and
Jane talked about whether Jane was eligible for vaca-
tion and holiday pay. She said Jane was upbeat and
very professional and did not seem at all stressed.

¶ 98. Late in the morning, Jane took a walk with
a co-worker, as the two often did. The co-worker testi-
fied that on that day, and in the month before her
death, Jane seemed "totally fine." The co-worker said
Jane seemed excited about Thanksgiving. She said
that while the two were walking, Jane's purse strap
broke. The two discussed whether the store where she
bought the purse might exchange the purse even
though Jane did not have a receipt. When they
returned to the office, Jane called TJ Maxx and learned
that she could return the purse even without a receipt.
At 3:15 p.m. that afternoon, as the parties stipulated at
trial, Jane exchanged the purse at TJ Maxx.

¶ 99. In addition to testimony that Jane's
demeanor in the days before her death seemed incon-
sistent with suicide, several witnesses testified that if
Jane were to commit suicide, she would not have done
so using a gun and an elaborate method of firing the
gun through a wall. Jane's brother Charles and her
mother Patricia Johnston testified that Jane was not
comfortable around guns. Charles testified: "[I]n my
entire lifetime I do not remember [Jane] ever touching
a gun, ever, which is kind of unique when you think of
the number of guns that were in our house."

¶ 100. Additionally, it is undisputed that the Neumanns did not have any guns in their home, so Jane would have had to acquire a gun and shells in order to commit suicide in this manner. Ultimately, no evidence was presented that Jane acquired a gun or shells.

¶ 101. Charles, Patricia and Jane's sister-in-law also testified that Jane was not mechanically inclined. Charles explained, "I'm fairly mechanical, but Jane was—was not mechanical. When I heard about the manner in which this supposedly happened, I thought it was greatly incredulous. I have never seen . . . a hammer in her hand.[17] ] She's not mechanically inclined."

¶ 102. Two witnesses, who did not know Jane, testified that they believed the death was a homicide. Richard Thompson, a forensic firearms examiner, said that it was unlikely Jane had committed suicide. Thompson explained that in the course of his investigation, he attempted to fire a shotgun according to the theory offered by law enforcement and Neumann. He said that he attached fishing line to the trigger of a shotgun and tried to wrap the fishing line around the butt of the gun. He then tried to discharge the gun by pulling the line as he held the muzzle. He said he experimented with various weights of line and that when he finally used thirty-pound fish line, he was able to discharge the gun "most of the time."

¶ 103. Thompson also said that the weight required to pull the trigger affected his success rate. He noted that because the gun that killed Jane is missing, he does not know how much weight was required to pull the trigger. In Thompson's tests, the lighter the

---

[17] The estate's expert and law enforcement concluded that the hole in the wall was probably made by blows from a hammer. A hammer was found in the basement.

weight required to pull the trigger, the easier it was to discharge the gun. When he used guns requiring seven pounds of weight, it was "extremely difficult" to discharge the gun. Finally, Thompson noted that the material on the butt of the gun affected the ease of firing the gun with the fishing line. "I found that firearms that had rubber recoil pads on were much more difficult to fire than those . . . with a . . . plastic butt plate."[18]

¶ 104. The jury also heard testimony from Jentzen, which we analyzed in detail earlier in this opinion. Jentzen testified that based on his review of the records, the photographs, his experience and the totality of the circumstances, it was his opinion that Jane's death was a homicide.

¶ 105. There was additional physical evidence that cast doubt on law enforcement's theory that the death was a suicide.[19] First, no fishing line (also referred to as monofilament line) or box of shells was ever recovered. Also, Thompson testified that he examined the hole in the wall and did not see any indication of score marks on the plasterboard that

---

[18] In his November 24, 1993, interview with police, Neumann said he thought the gun was a shotgun with rubber on the end of it which Neumann described as a recoil pad. This description led Thompson to include in his tests guns that had rubber recoil pads.

[19] We acknowledge that there was also evidence suggesting the death was a suicide, such as a lack of injuries that would suggest she fought off an attacker and evidence that Jane's right hand was on the barrel of the gun when it fired, suggesting she held the gun in her mouth. However, our role on appeal is to search the record for evidence to support the jury's findings, not to search for evidence to support findings the jury could have, but did not make. *See Heideman v. American Fam. Ins. Group*, 163 Wis. 2d 847, 863–64, 473 N.W.2d 14 (Ct. App. 1991).

would indicate a line had been placed through the hole and tied to the trigger.[20]

¶ 106. There was also evidence that there may have been a struggle. A lampshade in the room where Jane died was tilted, and the crime scene investigators found one of Jane's earrings bent and lying on the floor in the corner of the room. On cross-examination, chief deputy Max Ihrke from the sheriff's department acknowledged that a bent metal earring and a tilted lampshade could be evidence of a struggle. Jentzen testified that in his opinion, it was suspicious that "the earring is bent and there is not evidence of trauma on the body where that was pulled off."

¶ 107. Jentzen also testified that the barrel of the gun that extended into the family room may have been disguised. There was bubblewrap and electrical tape found in Jane's head and on the floor of the room that, Jentzen stated, could have been used to obscure the end of the weapon. Neumann testified that he remembered having pink bubblewrap in the house and that either he or Jane had brought it home from MedSource.

¶ 108. We conclude that the physical, opinion and anecdotal evidence presented constitutes sufficient credible evidence to support the jury's finding that Jane's death was a homicide. The next issue,

---

[20] Thompson indicated in his deposition that he performed his tests under the assumption that the fishing line would have passed through the larger of the two holes in the wall. Jentzen testified that he had been told the line supposedly passed through the smaller of the two holes. Neumann told investigators that the fishing line was tied to the trigger and then looped around a knob on the gun. He said the end of the fishing line was loose (not touching the holes or the wall).

therefore, is whether there is also credible evidence that Neumann was the murderer.

## B. Whether Neumann murdered Jane

¶ 109. Once the jury found that Jane was murdered, the jury could reasonably conclude that Neumann was the murderer. There is evidence that Neumann had both motive and opportunity to kill Jane. Also, his testimony that there was a suicide note is inconsistent with the death having been a homicide. Finally, the record reveals numerous lies, including lies that Neumann ultimately admitted, that could lead the jury to reject his testimony and rely on the testimony of other witnesses. Our review of the record leads us to conclude that there is credible evidence to support the jury's finding that Neumann murdered Jane.

¶ 110. There was evidence that Neumann had a financial motive to kill Jane. Neumann testified that he and Jane had approximately $45,000 in debt, in addition to their $125,000 mortgage, at the time of Jane's death. In the ninety-day period before Jane's death, the couple consulted with a bankruptcy attorney to determine whether to file bankruptcy; they decided not to file. It is undisputed that Neumann collected a $116,000 life insurance policy that had been issued to Jane just over two years before her death. Additionally, Neumann testified that the life insurance policy's suicide exclusion expired on November 18, 1993, four days before Jane's death.

¶ 111. The jury also heard evidence that suggested Neumann found his wife burdensome. Neumann testified that before Jane's death, he told co-worker Diane Fandler that Jane was emotionally unstable and needed his caregiving and emotional sup-

port. Zeller said that Neumann told him that he had to do the housekeeping and cooking, take care of Jonathan and provide emotional support. One of Neumann's co-workers who knew both the Neumanns testified, "The overall impression I had, not just on [one] occasion but on other occasions, was that Jim was dismissive of his wife. She seemed to be some baggage that [Neumann] had to carry around."

¶ 112. With respect to opportunity, the jury heard evidence that the medical examiner determined that the time of death was between 3 p.m. and 6 p.m. The medical examiner explained that he was not allowed into the Neumann home to examine the body until 5:30 a.m. the next morning, after physical evidence such as hair fibers was collected. As a result, the medical examiner was unable to take Jane's temperature in an effort to determine how long she had been dead. Instead, his estimate for time of death was based on evidence such as when the body was discovered.

¶ 113. Neumann argued that the evidence showed that he may have arrived home as early as 5:28 p.m. and as late as 5:55 p.m. Accordingly, Neumann had as many as fifty minutes and as few as twenty-three minutes to kill Jane and hide the gun.

¶ 114. Finally, there was evidence that Neumann lied before and after Jane's death, so the jury could have rejected his testimony as incredible. Before Jane's death, Neumann surrendered their dog to an animal shelter. He provided the animal shelter employee with a former address rather than his current address. The employee testified that when she completed the form, she filled in the reason for surrendering the dog that Neumann had given her: "owner passed away."

¶ 115. Zeller testified that before Jane's death, Neumann told him that the government wanted him to perform some service and was putting pressure on Neumann to do so. Zeller said that Neumann told him the government was "bugging" MedSource and showed Zeller a bugging device at Neumann's home. Another co-worker, Mary Jo Peters, testified that Neumann told her that he had been in the Army and had "moved up the ranks very rapidly." Peters said that Neumann told her that he was recognized as having a lot of computer skills and technical abilities, and that he had a propensity for understanding foreign languages. Because of that, he was asked to be part of a secret organization called the National Security Agency.

¶ 116. Peters and Zeller both testified that after Jane's death, Neumann told them on different occasions that there had actually been a bomb in the house the day Jane died. Zeller said that Neumann told him that when Neumann arrived home, "he believed that there was a bomb connected to the door and that he disarmed the bomb and found Jane. And there was no gun." Zeller said that approximately a year later, Neumann told him that he had made up the story about the bomb. Peters said that after Jane's death, she asked Neumann what had really happened. She testified that Neumann told her, "[N]o, there was not a gun. And he said that once he walked in the door he saw this bomb which was attached to the door."

¶ 117. At trial, Neumann testified that he had made up stories about being in the National Security Agency and there being a bomb:

> I think most of what [Peters and Zeller] said was fairly accurate. I told them that I had been a secret service agent of some kind, that I had done impor-

tant missions and that I had more important missions I could do, and I did connect that in a sense to Jane's death by saying that somehow that was involved in it. You know, I'd come home and found a bomb instead of a gun, and it was a stupid thing to do. There was absolutely no truth to any of it. . . .

At the time I felt somehow that it was going to build up their image of me.

¶ 118. Additional testimony from Jane's mother, Patricia, provided a basis for the jury to believe that Neumann was lying about Jane's death. Patricia testified that on August 3, 1994, Neumann came to her home and the two spoke privately in the living room. He told her that he had been notified that the family was looking into Jane's death and wanted to know "what was going on." Patricia said she asked him about a series of phone calls that he made from MedSource to the Neumann home between 3:55 p.m. and 5:07 p.m. the day Jane died. Patricia testified that Neumann told her, "I tried to reach her but I never could. And I didn't call anyone else because I knew it was already too late."

¶ 119. Patricia said that on another occasion, Neumann told her, "Pat, if you're so sure that Jane was murdered, she probably was. . . . [Y]our intuition as a mother is probably better than mine. I only know what I found." Patricia continued: "I said Jim, what about the suicide note? And he said, ['W]ell, I suppose somebody else could have written it[.'] That doesn't make any sense."

¶ 120. Testimony from Zeller, Peters and Patricia provides a basis for the jury to believe that Neumann was not a credible witness. Neumann's testimony could also be found incredible. Neumann testified that he found Jane's body and, within twenty seconds, made the decision to make the suicide look

like a homicide. He further testified that in the twenty-three to fifty minutes that elapsed before he called 911, he viewed the body, read the suicide note, hung a picture over the hole in the wall, packaged the gun, donned a trenchcoat, broke the front door, drove to the bridge, jumped a fence, ran out onto the bridge, dropped the gun, returned to his car, drove home and burned the suicide note. Given this list of activities and testimony about the time it would take to drive to the bridge and back, there is evidence Neumann would not have had time to do all the things he said he did.

¶ 121. Additionally, Neumann claims that there was a suicide note and that he burned it in the basement when he returned home from the river. However, one of the first officers to arrive at the scene testified that he walked through the home at approximately 6:45 p.m. and did not smell any odor of burning paper when he entered the residence or walked in the basement. ██

¶ 122. Neumann also testified that when he drove to the bridge, he stopped the vehicle just before going under the bridge. However, Zeller testified that the first time Neumann admitted he had intentionally destroyed the gun, he told Zeller that he parked in a gas station parking lot. Zeller testified:

> I said to [Neumann] why did you park there? And he said why do you ask? And I said because that's about a block further than you'd have to park. . . . [H]e said well, where would you park? And I said why wouldn't you park right by the bridge.

Based on this testimony, the jury could conclude that Neumann fabricated the story about going to the bridge, because he changed part of his story after Zeller

questioned the logic of his first parking location. In summary, there is ample evidence of Neumann's motive, opportunity and lack of credibility to support the jury's conclusion that Neumann was the murderer.

## VII. Request for new trial in the interest of justice

¶ 123. Neumann contends that he should be afforded a new trial in the interest of justice. We have the power to order a new trial if we determine that the real controversy has not been fully tried, either because the jury was erroneously not given the opportunity to hear significant testimony or because it heard evidence that should not have been admitted and that evidence clouded a crucial issue. *See State v. Johnson*, 149 Wis. 2d 418, 429, 439 N.W.2d 122 (1989). We have reviewed the transcripts of the trial testimony and the exhibits offered and admitted into evidence, and we conclude that no evidence was either improperly excluded or included in the trial. Additionally, we have concluded that the jury was properly instructed. Therefore, the real issue was fully tried, and we deny Neumann's request for a new trial.

## VIII. Challenge to the judgment for intentional infliction of emotional distress

¶ 124. Finally, Neumann challenges the judgment finding him liable for intentional infliction of emotional distress and awarding the estate compensatory and punitive damages. Neumann argues that the trial court erroneously allowed the plaintiff to amend the pleadings two years after the liability trial to add an intentional infliction of emotional distress claim,

that there is no factual basis to support the trial court's finding that Jane suffered emotional distress, and that Jane's claim for intentional infliction of emotional distress did not survive her death. We agree with Neumann's first two arguments and therefore reverse the judgment for intentional infliction of emotional distress. We decline to address the third issue because the first two are dispositive.

¶ 125. The estate's original complaint, filed in 1996, alleged claims for wrongful death and pain and suffering. In October 1998, a year after reaching the stipulation on wrongful death damages with his son, Neumann moved for summary judgment on any remaining damages issues, arguing the estate had no claim for damages because Jane had died instantly, so there was no claim for pain and suffering prior to her death after the gunshot.

¶ 126. In response, the estate argued for the first time, two years after the liability trial, that Jane had suffered from Neumann's intentional infliction of emotional distress in the minutes before she died. The estate moved to amend its pleadings, pursuant to WIS. STAT. § 809.02(2),[21] to add a claim for intentional inflic-

---

[21] WISCONSIN STAT. § 802.09(2) provides:

AMENDMENTS TO CONFORM TO THE EVIDENCE. If issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice such

tion of emotional distress.[22] Neumann opposed the amendment, arguing that intentional infliction of emotional distress was not pled in the initial complaint and not contemplated in the estate's responses to interrogatories. Neumann also argued that there was no evidence during the liability trial related to events leading up to the gun's discharge.

¶ 127. The day of the damages trial, the trial court granted the plaintiffs' motion to amend the pleadings. The trial court incorporated the following findings of fact in its oral decision: "[W]e know that Jane Neumann was forcibly put to the wall; that . . . she was put to the wall against her will and that she was murdered; and that there was a period of time when Jane . . . realized she was trapped and that death was imminent and then death followed."

¶ 128. Neumann contends that the trial court erroneously allowed amendment of the pleadings because the independent tort of intentional infliction of emotional distress was not tried during the liability phase of the case. Specifically, Neumann argues, the estate would have had to present evidence that (1) Neumann acted with the intent of causing emotional distress; (2) the acts were extreme and outrageous; (3) the acts caused injury to Jane; and (4) Jane suffered an extreme and disabling emotional injury. *See Alsteen v. Gehl*, 21 Wis. 2d 349, 359–60, 124 N.W.2d 312 (1963); WIS JI—CIVIL 2725.

---

party in maintaining the action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

[22] The estate conceded at oral argument that the original complaint did not state a claim for intentional infliction of emotional distress.

¶ 129. Having carefully examined the record, we agree with Neumann that there was no evidence presented that would lead us to conclude that the issue of intentional infliction of emotional distress was "tried by express or implied consent of the parties" as required by WIS. STAT. § 802.09(2). "It is within the trial court's discretion to allow amendments of the pleadings until and even after judgment. . . . [But] an amendment to the pleadings may not unfairly deprive the adverse party of the opportunity to contest the issues raised by the amendment." *Leciejewski v. Sedlak*, 116 Wis. 2d 629, 643, 342 N.W.2d 734 (1984). We conclude that the trial court erroneously exercised its discretion when it allowed the amendment because Neumann did not have an opportunity to contest the issues raised by the amendment. *See id.*

¶ 130. We also note that even if amendment of the pleadings was an appropriate exercise of discretion and the trial court had authority to make findings that Jane suffered emotional distress, there is insufficient credible evidence to sustain those findings. In *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 662, 517 N.W.2d 432 (1994), our supreme court dismissed a child's estate's claim for negligent infliction of emotional distress where the child was struck and killed by a truck while bicycling. The court concluded that the estate's claim should be dismissed on public policy grounds. *Id.* "It is mere speculation to assert that [the child] knew of the impending impact or suffered severe emotional distress in the moments before impact. Allowance of recovery under the circumstances of this case would be too likely to open the way to fraudulent claims." *Id.*

¶ 131. Although *Bowen* involved a claim for negligent infliction of emotional distress, we believe the reasoning is equally applicable under the circumstances of this case. There is no evidence to sustain the trial court's findings that Jane was forcibly put to the wall against her will, realized she was trapped and that death was imminent, and suffered emotional distress. Indeed, there is evidence to the contrary: Jentzen testified the gun may have been disguised with bubblewrap and electrical tape. If this was true, then Jane may not have known that death was imminent. In sum, the trial court's finding "that Jane Neumann suffered during that period of time between her death and her realization of impending death" cannot be sustained. *See id.*

## CONCLUSION

¶ 132. For the stated reasons, we reject Neumann's challenges to the jury verdict and deny his request for a new trial. We affirm the jury verdict holding Neumann liable for Jane's wrongful death and the judgment requiring Neumann to pay his son $482,903.26 in damages. However, we reverse the judgment for intentional infliction of emotional distress and the corresponding award of compensatory and punitive damages to the estate.

*By the Court.*—Judgments affirmed in part; reversed in part.