HOLYTZ, by Guardian *ad litem,* and another, Appellants, v. CITY OF MILWAUKEE, Respondent.

*May 1—June 5, 1962.*

For the appellants there were briefs by *Habush, Gillick & Habush,* attorneys, and *Robert L. Habush* of counsel, all of Milwaukee, and oral argument by *Robert L. Habush.*

For the respondent there was a brief by *John J. Fleming,* city attorney, and *Peter M. Stupar,* assistant city attorney, attorneys, and *Richard F. Maruszewski,* assistant city attorney, of counsel, and oral argument by *Mr. Stupar* and *Mr. Maruszewski.*

GORDON, J. The order of the trial court sustaining the respondent's demurrer to the complaint presents an issue with respect to the tort liability of a municipal corporation. The trial court found that on the facts alleged in the complaint the city was entitled to invoke the defense of municipal tort immunity. The appellants urge that the city may not invoke such defense because (a) the drinking fountain and the water-meter pit trapdoor were created and maintained by the city in its proprietary capacity, or (b) the meter contraption constituted a nuisance and at the time the injury occurred the relationship of governor to governed did not exist between Janet Holytz and the city of Milwaukee, or (c) the trapdoor was an "attractive nuisance" that was not created or maintained by the city in a governmental capacity.

Upon the facts of this case, we consider that the trial judge was correct in his conclusion that, based upon the past decisions of this court, no cause of action was asserted in the complaint. However, we are now prepared to disavow those rulings of this court which have created and preserved the doctrine of governmental immunity from tort claims. This makes it unnecessary that we rest this case on the elusive issues mentioned in the foregoing paragraph; the case turns exclusively on our abrogation of the principle of governmental immunity from tort claims.

The defendant urges that we ignore the appellants' challenge to the doctrine of governmental immunity because it was not raised in the trial court. Concededly, the general rule is that this court will not consider on appeal matters which were not presented to the trial court. *State ex rel. Mattison v. Baudhuin* (1955), 270 Wis. 249, 70 N. W. (2d) 674. In view of the unmistakable rulings of this court in a host of cases, it would have been futile to have expected the trial court to have countermanded the canon of municipal immunity. It is entirely understandable that the issue was not raised in the court below. This court has frequently considered questions on appeal which were not presented in the trial court. *Discher v. Industrial Comm.* (1960), 10 Wis. (2d) 637, 645, 103 N. W. (2d) 519; *General Electric Co. v. Wisconsin E. R. Board* (1958), 3 Wis. (2d) 227, 246, 247, 88 N. W. (2d) 691.

The rule of municipal tort immunity is knee-deep in legal esoterica: *e.g.,* governmental function versus proprietary function; relationship of governor to governed. The dogma of the rule is so deeply engrained in our case law that we deem it necessary to consider the historical origins of the rule and some of the critical assaults which have been made upon it.

### Historical Background of Tort Immunity.

The rule of sovereign immunity developed in this country from an English doctrine and has been applied in the United States far beyond its original conception. The doctrine expanded to the point where the historical sovereignty of kings was relied upon to support a protective prerogative for municipalities. This, according to Professor Borchard, "is one of the mysteries of legal evolution." Borchard, Government Liability in Tort, 34 Yale Law Journal (1924), 1, 4. It would seem somewhat anomalous that American courts should have adopted the sovereign-immunity theory

in the first place since it was based upon the divine right of kings.

The concept of municipal immunity from tort claims stems from the English case of *Russell v. Men of Devon* (1788), 2 T. R. 667, 100 Eng. Rep. 359. That was a case in which an unincorporated county was relieved of liability for damages which were occasioned by the disrepair of a bridge. One of the grounds advanced in the *Men of Devon Case* was that immunity was necessary because the community was an unincorporated one and did not have funds to pay for damages. A second reason advanced was "that it is better that an individual should sustain an injury than that the public should suffer an inconvenience." 100 Eng. Rep., page 362. In *Maffei v. Town of Kemmerer* (1959), 80 Wyo. 33, 42, 338 Pac. (2d) 808, 810, the argument was advanced that the *Men of Devon Case* in turn relied upon an earlier authority from Brooke's Abridgement. However, most historical analyses of the general thesis of municipal immunity agree that the *Men of Devon Case* was the judicial parent of the doctrine.

The first case in the United States which adopted the doctrine of the *Men of Devon Case* was *Mower v. Leicester* (1812), 9 Mass. 247, in which immunity was granted even though the county was a corporation and had corporate funds. Perhaps the leading case which adopted the rule in the United States is *Bailey v. New York* (1842), 3 Hill 531.

In Wisconsin, the first case which wholly adopted municipal immunity was *Hayes v. Oshkosh* (1873), 33 Wis. 314, 318, 14 Am. Rep. 760. That decision justified the rule on the following grounds:

"The grounds of exemption from liability, as stated in the authorities last named, are, that the corporation is engaged in the performance of a public service, in which it has no particular interest, and from which it derives no special

benefit or advantage in its corporate capacity, but which it is bound to see performed in pursuance of a duty imposed by law for the general welfare of the inhabitants, or of the community; that the members of the fire department, although appointed by the city corporation, are not, when acting in the discharge of their duties, servants or agents in the employment of the city, for whose conduct the city can be held liable; but they act rather as public officers, or officers of the city charged with a public service, for whose negligence or misconduct in the discharge of official duty no action will lie against the city, unless expressly given; and hence the maxim *respondeat superior* has no application."

The rules surrounding municipal tort immunity have resulted in some highly artificial judicial distinctions. For example, the municipality may be immune or liable depending upon whether we determine that the particular function involved is "proprietary" or "governmental." Our court held in *Christian v. New London* (1940), 234 Wis. 123, 290 N. W. 621, that a live wire which carried electricity from a municipal electrical utility to a municipal streetlight was maintained by the city in a proprietary capacity, but a municipal waterworks which supplied water to be used for fire fighting was operating in a governmental capacity. *Highway Trailer Co. v. Janesville Electric Co.* (1925), 187 Wis. 161, 204 N. W. 773. The operation of a municipal hospital, although generally a proprietary activity, may have some of its operations classed as governmental. *Carlson v. Marinette County* (1953), 264 Wis. 423, 59 N. W. (2d) 486.

In applying the "governor-to-governed" test we have adopted some additional artificial rules regarding immunity or liability. We have held that this crucial relationship did exist where a plaintiff was using a public toboggan slide and slid into an unprotected quarry, *Pohland v. Sheboygan* (1947), 251 Wis. 20, 27 N. W. (2d) 736, and where a

plaintiff fell into an open sewer ditch which ran through a public park, *Erickson v. West Salem* (1931), 205 Wis. 107, 236 N. W. 579. However, we have concluded that the relationship did not exist where a plaintiff walking on a public walk was hit by a baseball coming forth from a municipal playground, *Robb v. Milwaukee* (1942), 241 Wis. 432, 6 N. W. (2d) 222, or where a minor plaintiff was playing on a snow pile created by the city near a river, *Flamingo v. Waukesha* (1952), 262 Wis. 219, 55 N. W. (2d) 24.

### Criticism of the Rule of Tort Immunity.

There are probably few tenets of American jurisprudence which have been so unanimously berated as the governmental-immunity doctrine. This court and the highest courts of numerous other states have been unusually articulate in castigating the existing rule; text writers and law reviews have joined the chorus of denunciators. Some examples of the condemnation are here presented.

In *Britten v. Eau Claire* (1952), 260 Wis. 382, 386, 51 N. W. (2d) 30, this court stated:

"The doctrine that immunity from liability should be granted to the state and municipalities while engaged in governmental operations rests upon a weak foundation. Its origin seems to be found in the ancient and fallacious notion that the king can do no wrong."

In *Smith v. Congregation of St. Rose* (1953), 265 Wis. 393, 397, 61 N. W. (2d) 896, we again stated:

". . . this court has long felt that the reasons for granting such immunity to charitable and religious organizations, as well as to municipal corporations, are archaic, . . ."

Some of the judicial expressions in other states which have sharply decried the rule of immunity are as follows:

"This doctrine has been shot to death on so many different battlefields that it would seem utter folly now to

resurrect it. . . ." *Fowler v. Cleveland* (1919), 100 Ohio St. 158, 176, 126 N. E. 72, 77 (concurring opinion, WANA-MAKER, J.).

"Little time need be spent in determining whether the strict doctrine of municipal immunity from tort liability should be repudiated. All this is old straw. The question is not 'Should we?'; it is 'How may the body be interred judicially with nondiscriminatory last rites?' No longer does any eminent scholar or jurist attempt justification thereof." *Williams v. Detroit* (1961), 364 Mich. 231, 271, 111 N. W. (2d) 1, 10 (separate opinion, BLACK, J.).

" 'It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong," should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.' " *Barker v. Santa Fe* (1943), 47 N. M. 85, 88, 136 Pac. (2d) 480, 482.

"We, therefore, feel that the time has arrived to declare this doctrine anachoristic [sic] not only to our system of justice but to our traditional concepts of democratic government." *Hargrove v. Cocoa Beach* (Fla. 1957), 96 So. (2d) 130, 132.

"After a re-evaluation of the rule of governmental immunity from tort liability we have concluded that it must be discarded as mistaken and unjust." *Muskopf v. Corning Hospital Dist.* (1961), 55 Cal. (2d) 211, 213, 359 Pac. (2d) 457, 458.

"We conclude that the rule of school district tort immunity is unjust, unsupported by any valid reason, and has no rightful place in modern day society." *Molitor v. Kaneland Community Unit Dist.* (1959), 18 Ill. (2d) 11, 25, 163 N. E. (2d) 89, 96.

Some of the law-review and text-writers' expressions are as follows:

"If consistency in the law is necessary to give it prestige, as Judge LEARNED HAND has recently remarked, then this branch of the law is greatly in need of reform." Borchard, Government Liability in Tort, 34 Yale Law Journal (1924), 129, 130.

"Legal scholars and commentators since the turn of the century have almost unanimously condemned the confusions and contradictions of municipal tort law." Price and Smith, Municipal Tort Liability: A Continuing Enigma, 6 University of Florida Law Review (1953), 330.

"The municipal corporation today is an active and virile creature capable of inflicting much harm. Its civil responsibility should be coextensive." Harno, Tort Immunity of Municipal Corporations, 4 Illinois Law Quarterly (1921), 28, 42.

"Haven't we waited long enough for the elimination of this absurdity from the law?" Fuller and Casner, Municipal Tort Liability in Operation, 54 Harvard Law Review (1941), 437, 462.

"An overwhelming opinion throughout the world in favor of the assumption of community liability for the torts of public officers may be regarded as representing a growing moral conviction to which the courts should not remain impervious." Comment, Municipal Responsibility for the Torts of Policemen, 42 Yale Law Journal (1932), 241, 244.

"Although the court has been able to make inroads in mitigating the effect of governmental immunities, the present law is still unjust, inequitable, and patently unfair. A person's right to recover for damages inflicted upon him by another's negligence or nuisance should not depend upon such nebulous and vague principles as governmental function and the relationship of governor to governed." Bernstein, Governmental Tort Liability and Immunity in Wisconsin, 1961 Wisconsin Law Review, 486, 497.

The immunization of municipalities from tort liability has been chipped away by a number of statutes in this state. Some examples are secs. 101.01 and 101.06, Stats. (safe-place statute); sec. 345.05 (1) (c), (2) (a) (motor vehicle accidents); sec. 270.58 (judgments against public officers); and sec. 81.15 (highway defects).

Also, the judiciary has engrafted exceptions on the rule of municipal immunity from tort claims. Municipalities are responsible for negligence occurring in the operation of their proprietary activities. *Christian v. New London* (1940), 234 Wis. 123, 290 N. W. 621, and *Erickson v. West Salem* (1931), 205 Wis. 107, 236 N. W. 579. Municipalities are also responsible for nuisance whether acting in a governmental or proprietary capacity, as long as the municipality and the injured party did not stand in the relationship of governor to governed. *Blake v. Madison* (1941), 237 Wis. 498, 297 N. W. 422, and *Bernstein v. Milwaukee* (1914), 158 Wis. 576, 149 N. W. 382. Furthermore, municipalities are responsible for an "attractive nuisance" created in the exercise of a proprietary activity. *Britten v. Eau Claire* (1952), 260 Wis. 382, 51 N. W. (2d) 30. ("Attractive nuisance" is considered to be a form of ordinary negligence. *Smith v. Jefferson* (1959), 8 Wis. (2d) 378, 99 N. W. (2d) 119.)

### Is Abrogation Within the Court's Province?

The defendant argues that any change in the municipal-immunity doctrine should be addressed to the legislature. We recognize that earlier decisions of this court contemplated precisely that. See *Flamingo v. Waukesha* (1952), 262 Wis. 219, 228, 55 N. W. (2d) 24 (concurring opinion); *Britten v. Eau Claire* (1952), 260 Wis. 382, 386, 51 N. W. (2d) 30.

Not only have we previously expressed the view that any proposed change should be directed toward the legislature,

but we also have expressed the view that the legislature's failure to enact a bill which had been introduced constituted ". . . an expression by the legislature that no change should be made." *Schwenkhoff v. Farmers Mut. Automobile Ins. Co.* (1959), 6 Wis. (2d) 44, 47, 93 N. W. (2d) 867.

We are satisfied that the governmental-immunity doctrine has judicial origins. Upon careful consideration, we are now of the opinion that it is appropriate for this court to abolish this immunity notwithstanding the legislature's failure to adopt corrective enactments.

A comparable problem was presented in connection with the charitable-immunity doctrine. In *Smith v. Congregation of St. Rose* (1953), 265 Wis. 393, 398, 61 N. W. (2d) 896, it was noted that dissatisfaction with the charitable-immunity doctrine was properly a subject for the legislature. However, in *Kojis v. Doctors Hospital* (1961), 12 Wis. (2d) 367, 372, 107 N. W. (2d) 131, 107 N. W. (2d) 292, this court concluded that the doctrine with respect to paying hospital patients could be changed by the court as well as by the legislature:

"The defendant insists that if the rule be changed it should be done by the legislature and not by the court. This is upon the theory that questions of public policy are to be determined by the legislature. If that were strictly true then perhaps this court was in error in adopting the doctrine of charitable immunity in the first place. We do not think that is true. We believe the court was justified in acting as it did in 1917 in view of conditions as they then existed. The rule of *stare decisis,* however desirable from the standpoint of certainty and stability, does not require us to perpetuate a doctrine that should no longer be applicable in view of the changes in present-day charitable hospitals."

In *Hernandez v. County of Yuma* (Ariz. 1962), 369 Pac. (2d) 271, the supreme court of Arizona studied precisely the same problem and concluded:

"In *Lee v. Dunklee* this court refused to recede from the doctrine of governmental immunity, stating that the problem was legislative. We now express doubts concerning that statement. Concededly a court adopting a rule of law has the power to abrogate it. When the reason for the rule no longer exists, the court's responsibility does not terminate because the legislature through indifference or otherwise has not acted. Certainly there can be no justification for the extension of a rule universally criticized as an anachronism without rational basis. It requires but a slight appreciation of the facts to realize that if the individual citizen is left to bear almost all the risk of a defective, negligent, perverse, or erroneous administration of the state's functions, an unjust burden will become graver and more frequent as the government's activities are expanded and become more diversified."

The supreme court of New Jersey reached a similar conclusion in *McAndrew v. Mularchuk* (1960), 33 N. J. 172, 193, 162 Atl. (2d) 820, 832:

"The borough argues that any such change should come about, if at all, by action of the legislature. But the limitation on the normal operation of *respondeat superior* was originally placed there by the judiciary. Surely it cannot be urged successfully that an outmoded, inequitable, and artificial curtailment of a general rule of action created by the judicial branch of the government cannot or should not be removed by its creator."

As the supreme court of Washington observed in *Pierce v. Yakima Valley Memorial Hospital Asso.* (1953), 43 Wash. (2d) 162, 178, 260 Pac. (2d) 765, 774, "We closed our courtroom doors without legislative help, and we can likewise open them."

It is also urged that the immunity rule is a part of the common law which has been adopted by this state and can only be changed by the legislature pursuant to sec. 13, art. XIV. The limitation on judicial action implied by this provision of our constitution was examined in *Bielski v. Schulze*

(1962), 16 Wis. (2d) 1, 11, 114 N. W. (2d) 105, as well as in *State v. Esser* (1962), 16 Wis. (2d) 567, 115 N. W. (2d) 505. The doctrine of governmental immunity having been engrafted upon the law of this state by judicial provision, we deem that it may be changed or abrogated by judicial provision. But cf. *Maffei v. Town of Kemmerer* (1959), 80 Wyo. 33, 42, 338 Pac. (2d) 808, 810. The supreme court of Florida considered this problem in *Hargrove v. Cocoa Beach* (Fla. 1957), 96 So. (2d) 130, 132, and stated:

"Assuming that the immunity rule had its inception in the *Men of Devon Case,* and most legal historians agree that it did, it should be noted that this case was decided in 1788, some twelve years after our Declaration of Independence. Be that as it may, our own feeling is that the courts should be alive to the demands of justice. We can see no necessity for insisting on legislative action in a matter which the courts themselves originated."

*Scope of Abrogation.*

The issue immediately before the court relates to the liability of a city for torts. Abrogation of immunity necessarily raises various questions as to the breadth of our determination. One state, for example, limited the abrogation to negligent acts of *commission. McAndrew v. Mularchuk* (1960), 33 N. J. 172, 193, 162 Atl. (2d) 820, 832. In our opinion, this is an unwise limitation, and we consider that the abrogation should apply broadly to torts, whether they be by commission or omission.

Perhaps clarity will be afforded by our expression that henceforward, so far as governmental responsibility for torts is concerned, the rule is liability—the exception is immunity. In determining the tort liability of a municipality it is no longer necessary to divide its operations into those which are proprietary and those which are governmental. Our decision does not broaden the government's obligation so as

to make it responsible for all harms to others; it is only as to those harms which are torts that governmental bodies are to be liable by reason of this decision.

This decision is not to be interpreted as imposing liability on a governmental body in the exercise of its legislative or judicial or quasi-legislative or quasi-judicial functions. See *Hargrove v. Cocoa Beach* (Fla. 1957), 96 So. (2d) 130, 133. Also, the instant decision does not create any liability against a county for acts of a sheriff which are within the provisions of sec. 4, art. VI of the Wisconsin constitution.

If the legislature deems it better public policy, it is, of course, free to reinstate immunity. The legislature may also impose ceilings on the amount of damages or set up administrative requirements which may be preliminary to the commencement of judicial proceedings for an alleged tort. See, for example, the notice provisions and the limitation of the amount of damages in sec. 81.15, Stats.

Another problem which we foresee regarding the scope of this decision is the determination of what public bodies are within the scope of the abrogation of the rule. The case at bar relates specifically to a city; however, we consider that abrogation of the doctrine applies to all public bodies within the state: The state, counties, cities, villages, towns, school districts, sewer districts, drainage districts, and any other political subdivisions of the state—whether they be incorporated or not. By reason of the rule of *respondeat superior* a public body shall be liable for damages for the torts of its officers, agents, and employees occurring in the course of the business of such public body.

So far as the state of Wisconsin and its various arms is concerned, a careful distinction must be made between the abrogation of the immunity doctrine and the right of a private party to sue the state. The difference between gov-

ernmental immunity from torts and the sovereign immunity of the state from suit was recognized in *Apfelbacher v. State* (1915), 160 Wis. 565, 152 N. W. 144. The California constitution has a similar provision to that of Wisconsin so far as the right to sue the state. In abrogating the doctrine of governmental immunity from tort liability, the court discussed the distinction between tort immunity and consent on the part of the state to be sued. *Muskopf v. Corning Hospital Dist.* (1961), 55 Cal. (2d) 211, 216, 359 Pac. (2d) 457, 460.

Henceforward, there will be substantive liability on the part of the state, but the right to sue the state is subject to sec. 27, art. IV of the Wisconsin constitution which provides: "The legislature shall direct by law in what manner and in what courts suits may be brought against the state." The decision in the case at bar removes the state's defense of nonliability for torts, but it has no effect upon the state's sovereign right under the constitution to be sued only upon its consent.

The constitutional provision has been construed to require the passage of necessary legislation before *any* suit may be commenced against the state. *Chicago, M. & St. P. R. Co. v. State* (1881), 53 Wis. 509, 10 N. W. 560; *Houston v. State* (1898), 98 Wis. 481, 74 N. W. 111; *Schlesinger v. State* (1928), 195 Wis. 366, 218 N. W. 440.

Although the legislature created sec. 285.01, Stats., which authorized the commencement of suits against the state, this section has been construed to apply only to those claims which would render the state a debtor. *Houston v. State* (1898), 98 Wis. 481, 487, 74 N. W. 111. However, we do not consider the interpretation of sec. 285.01 before us and express no opinion upon the effect of the abolition of tort immunity upon the construction of this section of the statutes. The matter has not been briefed nor argued by counsel,

and we will reserve this question for subsequent determination.

## Prospective Abrogation.

To enable the various public bodies to make financial arrangements to meet the new liability implicit in this holding, the effective date of the abolition of the rule of governmental immunity for torts shall be July 15, 1962. See sec. 66.18, Stats., regarding liability insurance for both the state and municipalities. The new rule shall not apply to torts occurring before July 15, 1962. However, for the reasons set forth in the supplemental opinion in *Kojis v. Doctors Hospital* (1961), 12 Wis. (2d) 367, 373, 374, 107 N. W. (2d) 131, 107 N. W. (2d) 292, this decision shall apply to the case at bar.

*By the Court.*—Order reversed. Defendant shall have twenty days from the date the remittitur is filed in the circuit court to serve a responsive pleading.

CURRIE, J. (*concurring*). I concur fully in the foregoing opinion by Mr. Justice GORDON. However, I deem it necessary to explain the rationale behind our reversal of position on the effect to be accorded legislative action in defeating bills which would have abrogated a rule of law previously established by this court. Heretofore, this court has adhered to the view that rejection by the legislature of a bill of this character constituted a clear expression of legislative intent that the court-made rule was to be retained. Up to now this court has felt that, under our three-department system of government, comity required that courts yield to any determination of policy falling within the competence of the legislature, and that the court's hands were tied to change a court-made rule which the legislature had plainly indicated was to be retained.

However, we deem that the fallacy in the rationale of our former position is that legislative action defeating a proposed change of a court-made rule is a *per se* expression of legislative acquiescence in the rule. If there were any way of determining with certitude that all votes cast to defeat a bill of this character were intended as a legislative indorsement on the merits of the correctness of the court-made rule, it would be the duty of this court to yield to this expression of the legislative will. However, there is always present the possibility that some undeterminable number of legislators voted as they did because, inasmuch as the rule sought to be abrogated had been adopted by this court, they deferred to the supposed wisdom of the court, or else determined that the court should correct its own mistakes. Because of this possibility, I have reversed my hitherto held and expressed views, and have come to the conclusion that this court must face up to the responsibility of changing a court-made rule of law, which we deem the interests of justice require be changed, even though the legislature, by positive action short of codification has refused to make the change. The legislature still has the last word and may restore the court-abolished rule if it determines public policy so requires.