Robert HOSKINS, Vivian Hoskins, Estate of Roylan
D. Sims, Marsha Sims, Paul J. Scoptur, as Guard-
ian ad Litem of Roylan Sims, II and Marshall
Sims, Estate of James Hooper and Delores
Hooper, Plaintiffs-Appellants,†

v.

DODGE COUNTY, Wisconsin Municipal Mutual In-
surance Company, City of Beaver Dam and Co-
lumbia Casualty Insurance Company, FDB Selec-
tive Insurance Company of South Carolina,
Defendants-Respondents.

Court of Appeals

*No. 01–0834. Submitted on briefs September 12, 2001.—Decided
January 31, 2002.*

2002 WI App 40

(Also reported in 642 N.W.2d 213.)

† Petition to review filed.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Paul Gagliardi, Theodore B. Kmiec, III* and *Joseph M. Cardamone, III* of *Gagliardi, Nelson & O'Brien,* Salem.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *Robert E. Storck* of *Storck, Schnabl & Madden,* Madison and *Bruce A. Schultz* and *Laura N. Whipple* of *Coyne, Niess, Schultz, Becker & Bauer, S.C.,* Madison.

Before Vergeront, P.J., Deininger and Lundsten, JJ.

¶ 1. DEININGER, J. Robert Hoskins and several others[1] appeal a judgment dismissing their action against Dodge County and the City of Beaver Dam. Hoskins claims the trial court erred in concluding that the County and City were immune from suit for the actions complained of, and accordingly, granting defense motions for summary judgment. We conclude on de novo review that the defendants are entitled to summary judgment. Accordingly, we affirm.

## BACKGROUND

¶ 2. Hoskins claims on appeal, among other things, that there are genuine issues of material fact

---

[1] In addition to Hoskins and his wife, Vivian, the estates and next of kin of Roylan Sims and James Hooper are plaintiffs-appellants. The three men were occupants of the boat whose misfortune underlies this litigation. We will refer to all plaintiffs-appellants, collectively, as Hoskins.

that preclude summary judgment. We note, however, that he argued in the trial court that he should be awarded summary judgment on the issue of causal negligence, thereby implying no material facts were in dispute. The following background facts are taken from the parties' submissions on summary judgment. In the analysis which follows, we will discuss in more detail Hoskins's appellate claim that a material factual dispute precludes summary judgment in favor of the City and the County.

¶ 3. The evening of May 4, 1999, was rainy, windy and stormy in the Beaver Dam area. Shortly before midnight, Debra and Michael Krueger stepped out of their home adjacent to Beaver Dam Lake to check the weather. When they did so, they observed a boat containing three people, apparently having some motor difficulties in the vicinity of a neighbor's pier. The Kruegers called out to the "guys," asking if they needed any help. The Kruegers also turned on their waterfront lights and ultimately telephoned their neighbor, Vernon Block, to tell them what they had seen.

¶ 4. Debra Krueger saw one of the occupants of the boat wave "as though they were 'okay.'" The occupants of the boat had started their motor, but according to the Kruegers, "it seemed to be running poorly." The motor apparently stopped once and then restarted. In relaying the information to Block, the Kruegers indicated that they had seen the now departed boat collide with Block's pier.

¶ 5. Block arose and went to inspect his pier, observing that it had incurred some damage, presumably as a result of the collision with the boat that his neighbors had observed. Block called 911 and reported the incident to the City of Beaver Dam Police Department dispatcher. The 911 call transcript indicates that

Block told the dispatcher at just past midnight "somebody ran into my pier and smashed my pier." Block also stated that "they must be out on the lake, they looked like the people were having trouble . . . and if there [is], they got a hole in their boat they're not gonna make it, you know."

¶ 6. The City of Beaver Dam dispatcher verified that the address of the incident was outside of the city limits, and accordingly, passed the information to the Dodge County Sheriff's Department. The information relayed was that "a male subject called in and said a boat ran into his pier and took off, unknown if anybody's hurt, unknown if the boat has damage." The Dodge County Sheriff's Department dispatched Deputy Steven Moul to investigate at about half past twelve. Moul traveled to the scene and interviewed Block, Debra Krueger, and Michael Krueger. During a deposition, Moul testified that Mrs. Krueger told him the following:

> She stated that they started the boat and started to leave. The motor then stopped she heard. She asked again if they wanted to call the police and she then heard the boat start up again and one of the persons on the boat waved as if everything was okay and left and out of her sight.

Moul further testified that Mrs. Krueger did not seem overly concerned about the safety of the boat occupants, after they had waved and departed.

¶ 7. There is no dispute that an occupant of the boat did in fact wave to Debra Krueger, but Hoskins asserts in his reply brief that Deputy Moul did not learn that fact until sometime later. The sole surviving occupant of the boat, Robert Hoskins, testified in his deposition that the boat experienced difficulties, that it

collided with the Block pier, and that "[t]he lady come out and cut her lights on and we were still working trying to get the motor started." Hoskins stated that after the motor had been started, "I was the one that waved at them to let them know that we thought we could make it," and that the wave was an indication that the boat and occupants would "be all right now."

¶ 8. The Kruegers explicitly mentioned the "wave as though they were 'OK' " in their statement to a Department of Natural Resources (DNR) investigator. Later in the same statement, they indicated that "the Dodge Co. Sheriffs' Dept. . . . responded about 1 hour later; we relayed what we recalled seeing and he took a report." Officer Moul did not record in his police report that Debra Krueger had informed him about a boat occupant waving "OK" to her. The relevant portion of Moul's report reads as follows:

> They then heard a male subject yelling for help numerous times. Debra states she asked them if she should call 911. At this point a subject started the boat up and went towards the north from their residence. The boat went a short distance then the motor stopped. Again she was yelling at the subjects in the boat if they should call the police. They then started the boat up again and it headed, again, towards the north. Debra says that the motor sounded like it was not running right. The lights were not on the boat when the boat was moving. Debra says that she watched the boat until it was out of her sight in the dark. Debra believed that the boat struck Vernon Block's pier, which is her neighbor, but then she said she wasn't sure because she did not hear anything of that sort. It should be noted that it was windy during this time.

¶ 9. The investigating deputy observed some damage to the pier, and followed up by checking boat landings and driving around the area to see if any boats

had pulled up on shore. While the deputy was investigating at the scene, Dodge County dispatch contacted a DNR warden. The dispatcher told the warden that a boat had struck two piers, and that the boat "kept going but the end of the piers are pretty much tore off. They said the boat's gotta be damaged pretty heavily. And we[']re just worried about the thing sinking or something happening to it." The dispatcher inquired "[s]o do you want us to send Beaver Dam rescue boat out there to look or?" To which the warden responded, "I wouldn't." He further advised the department to treat it like a "regular hit and run," and he suggested that the officer should check the boat landings in the area.

¶ 10. At about three o'clock the following afternoon, a boater discovered Robert Hoskins floating in Beaver Dam Lake. At some point after colliding with Vernon Block's pier, the boat had swamped in the heavy wind and waves on the lake, and the three occupants clung to the swamped vessel for about twelve hours. Two of them ultimately drowned, and Hoskins survived.

¶ 11. Hoskins and the estates and survivors of the other two occupants of the boat commenced this action against Dodge County and the City of Beaver Dam, alleging that the defendants "were negligent with respect to a search and rescue," and "with respect to their duty to investigate upon notice that the plaintiffs were in danger." Both defendants moved for summary judgment, asserting their immunity under WIS. STAT. § 893.80(4) (1999–2000).[2] The court granted the

____

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

defense motions and subsequently entered judgment in favor of both defendants, dismissing all claims against them. Hoskins appeals.

## ANALYSIS

¶ 12. We review an order for summary judgment de novo, owing no deference to the trial court. *Waters v. United States Fid. & Guar. Co.*, 124 Wis. 2d 275, 278, 369 N.W.2d 755 (Ct. App. 1985). In reviewing a motion for summary judgment, we are to use the same methodology as the trial court, and "summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *M&I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.*, 195 Wis. 2d 485, 496–97, 536 N.W.2d 175 (Ct. App. 1995); Wis. Stat. § 802.08(2). We will reverse a decision granting summary judgment if the trial court incorrectly decided legal issues or if material facts are in dispute. *Coopman v. State Farm Fire & Cas. Co.*, 179 Wis. 2d 548, 555, 508 N.W.2d 610 (Ct. App. 1993).

¶ 13. Hoskins's first two arguments challenge the trial court's legal conclusions regarding a municipal entity's immunity from liability for the acts of its employees or agents. The immunity in question is sometimes referred to as "municipal" or "governmental" immunity, "public officer" immunity, or even "discretionary act" immunity, and it has been codified as follows:[3]

---

[3] State officers and employees also enjoy immunity from liability for acts performed within the scope of their office or employment. *Linville v. City of Janesville*, 174 Wis. 2d 571, 583, 497 N.W.2d 465 (Ct. App. 1993), *affirmed*, 184 Wis. 2d 705, 516 N.W.2d 427 (1994). The scope of state officer immunity "differs

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

Wis. Stat. § 893.80(4).

■

¶ 14. The phrase, "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions," might appear to encompass a relatively narrow range of official actions and decision-making. Case law, however, has defined the phrase as being synonymous with "discretionary" acts. *Linville v. City of Janesville,* 174 Wis. 2d 571, 584, 497 N.W.2d 465 (Ct. App. 1993), *affirmed,* 184 Wis. 2d 705, 516 N.W.2d 427 (1994). The supreme court has held that a fairly broad range of acts and decisions by municipal employees, especially those involving law enforcement, are immune from suit. *See Estate of Cavanaugh v. Andrade,* 202 Wis. 2d 290, 315, 550 N.W.2d 103 (1996) (a police officer's "decision to initiate or continue a high-speed chase"); *Barillari v. City of Milwaukee,* 194 Wis. 2d 247, 260, 533 N.W.2d 759 (1995) ("how best to utilize law enforcement resources" and "to carry out [law enforcement] responsibilities"); *Scarpaci v. Milwaukee County,*

in some respects" from municipal immunity under Wis. Stat. § 893.80(4), and it originates in the common law. *Id.; see also Kimps v. Hill,* 200 Wis. 2d 1, 10 n.6, 546 N.W.2d 151 (1996) (distinguishing state public officer immunity from municipal immunity, but noting that "the tests for immunity are similar").

96 Wis. 2d 663, 683, 292 N.W.2d 816 (1980) (a coroner's decision whether to conduct an autopsy).

¶ 15. Judicial decisions have also described several exceptions to a municipality's immunity for the acts of its officers and employees. *See Barillari*, 194 Wis. 2d at 257–58.[4] Hoskins maintains that the City and County cannot enjoy immunity on the facts of this case because the negligent acts he alleges were either "ministerial" in nature, or they involved a required response to a "known present danger." Some judicial decisions have treated these as two distinct exceptions to municipal or public officer immunity,[5] while others have recognized that a "known present danger" is perhaps best viewed as giving rise to a "ministerial" duty:

> [T]he court of appeals . . . described the . . . analysis of the "known danger" circumstances as a test to be applied to find liability even where an act is the result of a public officer's discretion, [however,] an interpretation . . . more consistent with the doctrine of immunity is that a public officer's duty is ministerial where a danger is known and of such quality that the public officer's duty to act becomes " 'absolute, certain and imperative . . . .' " . . . Stated otherwise, where a public officer's duty is not generally prescribed and defined by law in time, mode, and occasion, such that "nothing remains for judgment or discretion," circumstances may give rise to such a certain duty where . . . the

---

[4] Although the supreme court in *Barillari* discussed "exceptions . . . to this general rule of immunity," *Barillari v. City of Milwaukee*, 194 Wis. 2d 247, 257, 533 N.W.2d 759 (1995), the court has also stated that for municipal employees, in contrast to state employees, " 'the rule is liability—the exception is immunity.' " *Kimps*, 200 Wis. 2d at 10 n.6 (citing *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 39, 115 N.W.2d 618 (1962)).

[5] *See, e.g., Barillari*, 194 Wis. 2d at 257–58.

nature of the danger is compelling and known to the officer and is of such force that the public officer has no discretion not to act.

*C.L. v. Olson*, 143 Wis. 2d 701, 715, 422 N.W.2d 614 (1988) (citations and footnote omitted).

¶ 16. Hoskins points to no duty allegedly breached by employees of either Dodge County or the City of Beaver Dam on the night of May 4–5, 1999, that could be characterized as "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id.* at 711–12. That is, Hoskins points to no statute or other law that dictates the precise actions to be taken by dispatchers or law enforcement personnel when they receive information such as that provided by Block and the Kruegers just after midnight on May 5, 1999. Thus, Hoskins does not assert the existence of a ministerial duty like the one the supreme court acknowledged in *Andrade*, where the court determined that the City of Milwaukee "has a ministerial duty to have a written policy for high-speed chases which includes consideration of the severity of the offense," as required under WIS. STAT. § 346.03(6). *Andrade*, 202 Wis. 2d at 295, 300–01.

¶ 17. Rather, Hoskins's argument is that, given what Block reported to the City's dispatcher, and what Block and the Kruegers told Deputy Moul, both the City and the County became aware of a "known present danger of such force that the time, mode and occasion for performance is evident with such certainty that nothing remains for the exercise of judgment and discretion." *Olson*, 143 Wis. 2d at 717. We disagree.

¶ 18. As far as the City and County dispatchers were concerned, we conclude first that Block's 911 call did not communicate the presence of a "known, present danger." Block's report to the City dispatcher was conditional ("they must be out on the lake, they *looked like* the people were having trouble . . . and *if* there is, they got a hole in their boat they're not gonna make it, you know" (emphasis added)). Block did *not* report that the boat was sinking or that its occupants were incapacitated or overboard. At best, the information reported to dispatch, considered in a light most favorable to Hoskins, was such as to raise the possibility that a boat on Beaver Dam Lake *might* be in some type of danger. Thus, the dispatchers were not confronted with a danger that was "known and of such quality that the public officer's duty to act becomes 'absolute, certain and imperative,' " a danger that was "compelling and known to the officer and is of such force that the public officer has no discretion not to act." *Id.* at 715 (citations and footnote omitted).

¶ 19. Even if we were to conclude that what Block communicated via his 911 call constituted a known, present danger, we would not necessarily hold that the dispatchers had forfeited any claim to immunity for their actions in response. Neither dispatcher failed to act on the information they were provided. *See Lodl v. Progressive Northern Ins. Co.*, 2001 WI App 3, ¶ 17, 240 Wis. 2d 652, 625 N.W.2d 601, *review granted,* 2001 WI 88, 246 Wis. 2d 165, 630 N.W.2d 219 (May 8, 2001) (No. 00–0221) (noting that immunity when a "known present danger" is alleged may turn on whether law enforcement personnel "actually exercise discretion" or "simply [do] nothing"). The City's dispatcher promptly relayed Block's 911 report to the Dodge County Sheriff's

Department, and the County in turn promptly dispatched a deputy to investigate. Additionally, the County contacted DNR personnel for advice on whether to request a waterborne search.

¶ 20. The actions of the dispatchers in this case thus stand in sharp contrast with those of the dispatcher in *Domino v. Walworth County*, 118 Wis. 2d 488, 347 N.W.2d 917 (Ct. App. 1984), where we concluded that the County did not enjoy immunity for the actions or omissions of its sheriff's department dispatcher. *Id.* at 491–92. The dispatcher received a report of a downed tree which had fallen across a public road, and she promptly assigned a patrolling deputy to investigate. *Id.* at 490. Thereafter, however, the dispatcher diverted that officer to the scene of a personal injury accident, and she neither assigned another officer to investigate the downed tree report, nor did she inform township authorities of it. *Id.* We reversed the trial court's grant of summary judgment to the County, concluding that the dispatcher's "duties, under the facts of this case, appear absolute, certain or imperative within the meaning of *Cords*."[6] *Id.* at 492–93. Our holding in *Domino* is of no assistance to Hoskins, however, given that the dispatcher in that case essentially "did nothing" in response to the "known present danger" of a tree having fallen across a public road, while the dispatchers in this case did *not* "do nothing" in response to the reports they received of a possibly dangerous situation.

¶ 21. We also reversed a summary judgment granted in favor of a municipality in *Lodl*, concluding

[6] *Cords v. Anderson*, 80 Wis. 2d 525, 259 N.W.2d 672 (1977), is the seminal case in Wisconsin regarding "known and present danger." There, a park manager knew of an existing dangerous condition and "failed to do anything about it." *Id.* at 541.

that a police officer dispatched to direct traffic at an intersection whose traffic light was inoperative during a storm, may have "failed to act at the intersection." *Lodl*, 2001 WI App 3 at ¶ 1. The record on summary judgment contained contradictory accounts regarding whether the officer actively attempted to direct traffic at the intersection, or simply stood by and watched. *Id.* at ¶ 15–17. Here, there is no dispute regarding what City and County dispatchers did in response to Block's 911 call; the dispute is over what more, in Hoskins's view, they should have done. *Lodl* does *not* stand for the proposition that municipal immunity is unavailable whenever a claim alleges an inadequate response by emergency personnel to a dangerous situation. Rather, our holding in *Lodl* was that if the summary judgment record indicates support for a possible finding that emergency personnel "did nothing," summary judgment may not be granted in favor of the municipal actors on an immunity claim under WIS. STAT. § 893.80(4). *Id.* at ¶ 17.

¶ 22. We next consider whether the information obtained by Deputy Moul when he went to investigate elevated the equivocal report of a boat possibly being in distress on a stormy lake, to a danger that was "compelling and known to the officer and [was] of such force that" Moul had "no discretion not to act." *Olson*, 143 Wis. 2d at 715 (citations and footnote omitted). The facts of *Linville* bear some resemblance, given that municipal emergency personnel were also dispatched in that case and two persons ultimately drowned. We concluded in *Linville* that emergency responders were *not* entitled to immunity when they failed to act promptly in commencing rescue efforts on behalf of two persons trapped inside a submerged vehicle. *Linville*, 174 Wis. 2d at 587–88. A shift commander and several paramedics had arrived at the scene, learned that a van

had submerged into the waters of a pond with its two occupants trapped inside, but they "did nothing to rescue [an occupant] for twenty minutes after their arrival." *Id.* at 586. We concluded that "the paramedic present at a life-threatening danger, such as a drowning, has a ministerial duty promptly to attempt a rescue," and we reversed a summary judgment in the paramedics' favor. *Id.* at 587–88.

¶ 23. Although the tragic outcome in *Linville* is regrettably similar to the present case, the underlying facts are readily distinguishable from those now before us. There was no question in *Linville* that persons were then and there in peril, and that immediate action to effect a rescue was imperative. Here, the information communicated to the investigating deputy at the scene of the report was at least as ambiguous as the initial 911 call, and if anything, it was perhaps less ominous than Block's initial report. Moul learned from the Kruegers that the boat had experienced some motor troubles and collided with Block's pier, but that it then departed on its own power after one of the boat's occupants had waved to Debra Krueger to indicate they were "O.K."[7]

■

¶ 24. To come squarely within our *Linville* holding, the witnesses would have had to tell Deputy Moul that a person had gone overboard and was then and there in the water, needing to be rescued. The information conveyed to Moul was many steps removed from

[7] We consider below Hoskins's claim that there is a genuine dispute in the record on summary judgment as to whether the Kruegers informed Deputy Moul that an occupant waved "O.K." on the night of the incident, or, as the dissent maintains, whether differences between what the Kruegers say they told the deputy as opposed to what he claims they told him preclude summary judgment for the County.

that dire circumstance. The mere fact that the boat occupants, after restarting their motor, had chosen to motor off across the lake instead of landing it at the Block or Krueger piers, which were immediately at hand, indicates that notwithstanding Block's or the Kruegers' fears, the boat occupants did not perceive themselves to be in danger. We conclude that the information provided to Deputy Moul did not present a known and compelling danger, of such force that his duty to summon personnel and equipment for an immediate waterborne rescue was absolute, certain and imperative. The circumstances were such that the deputy was entitled to exercise his discretion to forego immediate search and rescue efforts, and to follow up instead by checking the shoreline and boat landings in the area for any signs of the boat in question. *See Olson*, 143 Wis. 2d at 715.

¶ 25. We next consider Hoskins's claim of a material factual dispute which would preclude summary judgment for the County and the City. We, like the trial court, are prohibited from deciding issues of fact and must only decide whether a factual issue exists. *Coopman*, 179 Wis. 2d at 555.

¶ 26. Although Hoskins devotes several pages of his opening brief to a heading entitled, "The trial court erred in granting summary judgment as a genuine issue of material fact existed," he points to none. Instead, he argues in this section that "there cannot really be any question that the situation that presented itself was a compelling and known danger," which is a disputed legal conclusion not a disputed fact. He also contends, "in the alternative," that "Deputy Moul did nothing in regard to the known danger," but that is also not a dispute of fact but a characterization of the facts. In

297

short, Hoskins points to nothing in his opening brief which places in dispute the facts on which we rely.

¶ 27. Also under the heading asserting a dispute of material fact, Hoskins cites two affidavits he submitted in opposition to the defense motions for summary judgment, which he claims the defendants failed to rebut or refute. The first affidavit is from a "law enforcement expert," who opined:

> [T]he facts and circumstances that existed on May 4 & 5, 1999 at Beaver Dam Lake ... required no thought process with regard to the emergency procedure and handling by the law enforcement officers for Dodge County and the City of Beaver Dam. This duty does not require the exercise of discretion and in effect is a ministerial act to simply follow standard procedures expected of a deputy sheriff under like or similar circumstances.

The expert also opined that the County and City officers were negligent in their handling of the situation. Similarly, a "police science communications expert" opined, in very similar language, that a certain response was required "without hesitation or thought" by City and County dispatchers; that their duty "does not require the exercise of discretion and in effect is a ministerial act to simply follow standard procedures expected of a 911 dispatcher"; and that the dispatchers, too, had been negligent.

¶ 28. These expert opinions, however, do not create a factual dispute that precludes summary judgment on the issue of immunity under Wis. Stat. § 893.80(4). First, to the extent that the experts rendered opinions that the various municipal actors had performed below requisite standards of care, those "facts" are not material to a determination of whether the municipal defendants

298

are nonetheless immune from suit. As the supreme court has explained:

> Just because a jury can find that certain conduct was negligent does not transform that conduct into a breach of a ministerial duty . . . . Indeed, we begin our review of this case on the assumption that negligence exists here; if it were otherwise, [the defendants] would not need to seek the protection of immunity.

*Kimps v. Hill*, 200 Wis. 2d 1, 11–12, 546 N.W.2d 151 (1996). Furthermore, to the extent that the experts offered opinions on the legal question of whether, on the undisputed facts of this case, the municipal actors had a ministerial duty to respond in a certain way, those opinions were not "evidentiary facts." *See* Wis. Stat. § 802.08(3); *Physicians Plus Ins. v. Midwest Mut. Ins.*, 2001 WI App 148, ¶ 54 n.19, 246 Wis. 2d 933, 632 N.W.2d 59 (noting that affidavits made on "information and belief," or those which allege "ultimate facts" or conclusions of law, must be disregarded).

¶ 29. Hoskins first asserts the existence of what might truly be a factual dispute in his reply brief. He contends that "there is nothing contemporaneous with the investigation to indicate that Deputy Moul or anyone else representing the [City and County] was aware" on the night in question that Hoskins had waved "O.K." to the Kruegers. First, we note that we generally do not address an argument first made in a reply brief. *Swartwout v. Bilsie*, 100 Wis. 2d 342, 346 n.2, 302 N.W.2d 508 (Ct. App. 1981).[8] Moreover, we reject Hoskins's assertion that the record discloses a dispute over whether the

---

[8] In its response brief, the City states that "[i]t is difficult to determine exactly which facts appellants claim are disputed." As we have discussed above, we agree with this observation,

Kruegers informed Deputy Moul of the "O.K. wave" when he interviewed them after responding to the scene.

¶ 30. We agree with Hoskins that the account by the Kruegers regarding the "O.K. wave" is significant only if they informed Deputy Moul of it during his initial investigation, given that he testified that he relied on that account in forming his judgment that no life-threatening emergency then existed. We also acknowledge that the account is not contained in Moul's written report, and further, that one of the dispatchers testified at a deposition that she may have learned about the "O.K. wave" at some later time. Moul, however, stated in both an affidavit and at his deposition that Debra Krueger reported the fact to him that night. Moul's account is not contradicted in Debra's affidavit, nor in the statement the Kruegers gave to the DNR investigator.[9] Thus, Deputy Moul's testimony that he was informed by the Kruegers of the "O.K. wave" when he first interviewed them stands unrefuted in the record.

concluding that Hoskins failed to identify any disputed material facts in his opening brief. One of the reasons for our "general rule" of not addressing arguments first raised in a reply brief is that it deprives the respondent of the opportunity to make countering arguments, as the briefs in this case demonstrate. *See Baraboo Nat'l Bank v. State*, 199 Wis. 2d 153, 157 n.1, 544 N.W.2d 909 (Ct. App. 1996).

[9] In the affidavit, Debra indicates that she communicated her concerns about the safety of the boat occupants to Deputy Moul, but she does not deny also telling him that one of the men waved "O.K." before the boat departed the pier area. In their statement to the warden, the Kruegers affirm that Debra "saw one of the people wave as thought they were 'OK' and were taking off," and that they "relayed what we recalled seeing and [the deputy] took a report."

¶ 31. We conclude that Hoskins has pointed to no disputes of material fact that would render summary judgment inappropriate on the issue of whether the City and County are immune from suit for the actions of their employees on the night in question. The dissent, however, correctly notes that we may independently conclude from our de novo review of the summary judgment record that material facts are in dispute, even if the parties have not identified the disputed facts. *See Grotelueschen v. American Family Ins. Co.*, 171 Wis. 2d 437, 462, 492 N.W.2d 131 (1992) (Abrahamson, J., dissenting) (noting that parties may "erroneously conclude that no factual dispute exists when in reality one does," and thus a court must determine on its own whether a genuine issue of material fact exists, which is "a question of law for the court, not for the parties"). Specifically, the dissent concludes that the variance between what the Kruegers indicate they told Deputy Moul, and his own version of their account, creates a genuine dispute of material fact that precludes summary judgment in the County's favor. We disagree.

¶ 32. In Debra Krueger's affidavit, submitted by Hoskins, Debra states that before seeing the boat she observed that there were "white caps on the lake with three to four foot waves," and that the waves "were crashing over the sea wall by five to six feet onto the grass, which was very unusual." For his part, Moul acknowledged that it was "windy and raining on and off" when he arrived at the scene, that there were "somewhat" strong winds and storms, and that the lake was "rough" that night. He also testified that the waves were "pretty high" and that they were "crashing against the seawall." We conclude that there is no dispute that

301

conditions on the lake were adverse, and that if a disabled or badly damaged boat were on the lake, its occupants would arguably be endangered.

¶ 33. Debra Krueger goes on in her affidavit to relate that she heard a voice calling for help, saw that Block's pier was damaged, and that three men were in a boat drifting toward the Krueger pier. She states further that after her husband turned on the dock lights and procured a spotlight, one of the men in the boat waved and she heard the motor start "but it didn't sound right." She then avers:

> I was extremely concerned for the safety of these men as we knew they were in trouble. The motor stopped and started again. We couldn't see any lights on the boat. Even when the motor was running, it never sounded right.

Debra's account of her conversation with the deputy after he arrived in response to Block's 911 call is as follows:

> I told the deputy that the boat had hit Mr. Block's pier and that the men had been yelling for help from the boat. I told the deputy that I thought the boat was having motor trouble because it didn't sound right. I kept stressing to the deputy that the men in the boat were in trouble and that I didn't think they would make it. They weren't OK. Mike and I kept emphasizing that we were concerned for the safety of the men in the boat. We repeated this three to four times. The deputy went down to the lake to look at the pier and then we went into [Block]'s garage where he took statements from us. He then got back into his squad car and left.

¶ 34. The Kruegers' statement to the DNR warden regarding what they had observed is similar. The handwritten statement includes the following:

12:05 A.M. I set up my spotlight, and my wife then saw one of the people wave as though they were "OK" and were taking off. They had gotten their motor started, but it seemed to be running poorly. At this time we were worried about their safety.

My wife then ran to the house and called a DNR number, after no answer she came back to the boathouse as I was trying to tell the boat driver to wait. I was trying to put the light on the boat again. At no time did I see any boat running lights at all.

The boat was drifting down the lake to the north. My wife then ran over to my neighbor's . . . pier. She shouted, "Do you want me to call 911?"

Shortly afterward, my wife heard their motor start again and the boat headed out slowly on the shore side of a small rock pile. She recalled that the motor sounded like it was not running well. We did not have any contact with the boat after I lost them in my spotlight.

Deb called my neighbor . . . at about 12:15 A.M. and informed him that his pier had been hit. Vern called the Dodge County Sheriff's Department and they responded about one hour later. We relayed what we recalled seeing and he took a report.

¶ 35. Deputy Moul's written report of his interview with the Kruegers is consistent with the Kruegers' accounts of what they observed and reported to him. (See quotation from report in ¶ 8 above.) Specifically, the deputy noted the initial yell for help from the boat occupants, the motor stopping and restarting, and the boat then proceeding north on the lake with its motor not sounding "like it was running right." The only significant discrepancy between the Kruegers' and Moul's versions of their conversation stems from cer-

tain responses Moul gave during his deposition. The deputy testified that Debra said "she thought everything was fine" after a boat occupant had waved to her, and that he did not believe Debra was worried about the safety of the three men after that.

¶ 36. Unlike the dissent, we conclude that to the extent there is a dispute between what Moul and the Kruegers relate regarding their conversation of May 5, 1999, it does not create a genuine issue of material fact so as to preclude summary judgment in the County's favor. *See Baxter v. DNR*, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991) (noting that the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact" (citation omitted)). Material facts are those that are of consequence to the merits of the litigation. *Michael R.B. v. State*, 175 Wis. 2d 713, 724, 499 N.W.2d 641 (1993).

¶ 37. The summary judgment submissions disclose no dispute regarding what the Kruegers actually saw and reported to Moul. The observed events, however, as we have discussed, were equivocal. On the one hand, it was a stormy night, the lake was rough, and a boat had experienced motor problems and collided with a pier. On the other hand, the boat's motor had restarted, an occupant had waved an "O.K." to Debra Krueger, and the occupants had elected to motor off instead of landing and disembarking.

¶ 38. The variance in the two accounts of the conversation involves the impressions or conclusions the Kruegers formed from the events they had observed, and the degree to which they communicated their opinions to Moul. The Kruegers assert that they were very concerned for the safety of the boat occupants

based on what they had observed, and that they emphatically communicated that concern to Moul. Moul, however, did not perceive the Kruegers as being overly alarmed and claimed that Debra Krueger said "she thought [the boat occupants] were okay."

¶ 39. We conclude that any dispute regarding whether or how strongly the Kruegers communicated their concerns for the safety of the boat occupants is not material to a determination of whether, on the facts known to the officer, there existed a "known, present danger." Stated another way, we conclude that the existence of a "known, present danger" should not turn on the subjective impressions of a citizen-witness. As we have explained, a "public officer's duty to act becomes 'absolute, certain and imperative,' . . . [when] the nature of the danger is compelling and *known to the officer* and is of such force that the public officer has no discretion not to act." *Olson*, 143 Wis. 2d at 715 (emphasis added). A ministerial duty should arise only when a court can confidently say that, based on the objective facts observed by or reliably communicated to the officer, only one course of action was open to him or her. To conclude otherwise would be to require public officers to act on the subjective impressions of witnesses instead of on the facts they have gathered.[10]

---

[10] One reason that a court should not rely on the impressions of witnesses regarding the facts they communicate to law enforcement officers is that the impressions may change over time. Debra Krueger said in her affidavit that when she learned of the drownings the next day, "I felt terrible because I believe that all of this could have been avoided if the deputy sheriff had followed through and sent some one out on the lake to look for the disabled boat that we told him we were concerned about." Just as Debra's regret over the tragedy that subsequently

¶ 40. In short, even if we accept the Kruegers' version of what they told Deputy Moul *in toto,* and thus accept that they were concerned for the safety of the boat occupants and that they emphatically communicated their concerns to Deputy Moul, the fact remains that the objective information they provided to Moul falls short of establishing a "compelling" danger, "known to [Moul] of such force that [he had] no discretion not to act." *Id.*

¶ 41. Hoskins makes three additional arguments but none are persuasive. First, he contends the City and County had a ministerial duty to enter into a "joint powers agreement" under WIS. STAT. § 146.70(9), and that their failure to do so somehow renders his claims against the municipal entities actionable. We disagree.

¶ 42. The cited statute requires public agencies who establish a combined 911 emergency dispatch system to enter into agreements under which, "if an emergency services vehicle is dispatched in response to a request through the basic or sophisticated system established under this section, such vehicle shall render its services to the persons needing the services regardless of whether the vehicle is operating outside the vehicle's normal jurisdictional boundaries." Section 146.70(9)(a). Agencies are also required to file a copy of

occurred may have colored her recollection of the urgency with which she communicated her concerns to Deputy Moul, the fact that the County was being sued for failing to act on the Kruegers' report provided a strong incentive for Moul to understate the Kruegers' concerns and the degree to which they communicated them. We conclude that a court stands on firmer ground if it confines a determination of whether a "known, present danger" existed to the factual observations of the officer and witnesses.

the joint powers agreement with the Department of Justice, which is authorized to "commence judicial proceedings to enforce compliance" with the statute's requirements. Section 146.70(9)(c). Hoskins asserts that, "[w]hile it is only speculation, it seems reasonable to think that if an agreement had been filed, the Department of Justice would have been able to advise the municipalities how best to deal with situations like this one."

■

¶ 43. We agree with the City's observations that "summary judgment is decided upon the facts in the record and not speculation," and that "the existence or nonexistence of a written agreement [under WIS. STAT. § 146.70(9)] has no effect on the present case." The record discloses no jurisdictional dispute between the City and County regarding which entity was responsible for initially responding to Block's 911 call. Neither was there "an emergency services vehicle . . . dispatched in response to a [911] request" that subsequently refused to "render its services to the persons needing services" because the vehicle was "operating outside the vehicle's normal jurisdictional boundaries." Section 146.70(9)(a). The cited statute simply has no bearing on the events of May 4–5, 1999, or on the legal consequences which flow from them.

■

¶ 44. Next, Hoskins asserts that the trial court erred by "not addressing the issue of whether the defendants negligently relied on the Department of Natural Resources to perform a rescue." He claims that because the department "had no duty whatsoever to assist or to rescue," the County's call to the DNR warden seeking his advice "constituted one more example of the negligence that permeated the handling of

this situation." As with an earlier argument, Hoskins again confuses the issues of negligence and immunity. See *Kimps*, 200 Wis. 2d at 11–12. Even if the County was negligent in relying on the DNR warden's advice to treat the matter as a "hit and run" incident, the existence of negligence is irrelevant to the issue of whether the City and County are immune from suit for the actions of their personnel on the night in question. *Id*.

■

¶ 45. Finally, Hoskins claims the trial court erred in "not addressing the spoliation issue in regards to the missing portions of the 911 tape." Apparently, a portion of Block's initial 911 call to the City dispatcher was missing from the transcript produced in response to discovery demands. Hoskins concedes that he is "not at this time contending that there has been an intentional act" on the City's part to withhold or destroy evidence, but he claims there is cause for "speculation as to what might have been on" the missing portion. Hoskins's concession ends the matter, given that no sanctions may even be considered unless there is clear and convincing proof that evidence was deliberately destroyed or withheld. *Estate of Neuman v. Neuman*, 2001 WI App 61, ¶ 80–83, 242 Wis. 2d 205, 626 N.W.2d 821. Moreover, as the City notes, Block himself provided a statement to Hoskins which included an account of what he told the City dispatcher during his 911 call. The fact that the transcript of Block's 911 call was incomplete is thus of little consequence to the issues in this appeal.

## CONCLUSION

¶ 46. For the reasons discussed above, we affirm the appealed judgment.

*By the Court.*—Judgment affirmed.

¶ 47. VERGERONT, P.J. (*dissenting*). I agree with the majority's analysis and conclusion on City of Beaver Dam's immunity from suit. I write separately because I do not agree with its analysis and conclusion on Dodge County's immunity. In my view there is a conflict between Deputy Steven Moul's deposition testimony, on the one hand, and Debra Krueger's affidavit and the Kruegers' statement to the DNR, on the other, and the conflict is a genuine issue of material fact. As the majority acknowledges, there is no dispute that the conditions on the lake were rough. Given those conditions, I conclude that if a fact finder believes that Debra Krueger told Moul that the boat had hit the neighbor's pier, the motor stopped and started again but did not sound right, and she thought the boat was in trouble and might not make it, Moul was confronted with a known present danger of such force that he had no discretion not to act to determine if the people in the boat needed to be rescued. It is not disputed that Moul took no such action. Looking on the shoreline for the boat approximately one hour after the boat left the shore and checking other boat landings for the boat were not acts Moul undertook to determine if the people in the boat on the lake were in danger; according to Moul, he treated the incident as hit-and-run property damage, and that is what he was investigating when he took those actions.

¶ 48. I do not agree with the majority that if a fact finder believes Debra Krueger, Moul was faced with an ambiguous situation and therefore had the discretion to decide, without any further investigation, that the people in the boat were not in danger. Nor do I agree that, solely because the information was relayed to him

by a witness, Moul had the discretion to disregard it without further investigation. This is not a case where the officer testified that he had reason to doubt the account of a witness nor a case where, for some other reason, the officer decided not to act based on the witness's account. Rather, Moul denies Debra Krueger gave him the account of her observations that she says she did.[1]

¶ 49. I do not view the testimony of the hand wave from the boat as removing a factual dispute over whether Moul was confronted with a known present danger. Drawing all reasonable inferences in Hoskins's favor, the hand wave occurred before Debra Krueger heard the motor stop and start again, not sounding right. According to her affidavit, she did not tell Moul that she thought everything was okay when the boat left, but just the opposite.

¶ 50. I do not agree with the majority's implicit premise that the facts in this case must come "squarely within" *Linville v. City of Janesville*, 174 Wis. 2d 571, 586–88, 497 N.W.2d 465 (Ct. App. 1993), *aff'd,* 184 Wis. 2d 705, 721, 516 N.W.2d 427 (1994), in order for a known present danger to exist here. I do not agree that a known present danger did not exist here simply because Moul was not told that "a person had gone overboard and was then and there in the water, needing to be rescued." In *Cords v. Anderson*, 80 Wis. 2d 525, 541–42, 259 N.W.2d 672 (1977), a park trail within inches of a bluff edge, which a park manager knew of but did nothing to warn others of, was a known present danger. In *Lodl v. Progressive Northern Ins. Co.*, 2001

---

[1] At his deposition, Moul testified that he did not borrow a boat to look for the men on the lake because Debra Krueger said she thought they were okay.

WI App 3, ¶ 17, 240 Wis. 2d 652, 625 N.W.2d 601, *review granted,* 2001 WI 88, 246 Wis. 2d 165, 630 N.W.2d 219 (May 8, 2001) (No. 00–0221), an intersection with inoperative traffic lights in a storm was a known present danger requiring the officer dispatched to direct traffic to actively attempt to do that rather than stand by. If Debra Krueger's account of what she told Moul is accepted by a fact finder, I do not believe that Moul was confronted with a danger that was less compelling—less present or known—than those in *Cords* and *Lodl.*

¶ 51. Because I conclude there is a genuine issue of material fact with respect to the County's immunity from suit, I conclude the County was not entitled to summary judgment in its favor on this ground. Therefore, I respectfully dissent.